ZEICHNER ELLMAN & KRAUSE LLP
William T. Marshall, Jr. **(WM0626)**
33 Wood Avenue South, Suite 110
Iselin, NJ 08830
Telephone: (973) 618-9100
Direct Dial: (973) 852-2660

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CONSUMER DATA INDUSTRY ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW J. BRUCK, in his official capacity as ATTORNEY GENERAL FOR THE STATE OF NEW JERSEY, <br><br> Defendant. | Civil Action No. 3:19-cv-19054-BRM-TJB |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RELIEF UNDER THE DECLARATORY JUDGMENT ACT

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................1

STANDARD OF REVIEW .....................................................................................4

ARGUMENT ...........................................................................................................6

I.     REVISED 56:11-34 IS PREEMPTED BY THE FCRA. ...............................7

   A.   The FCRA Comprehensively Regulates the Provision of Consumer File Disclosures. .....................................................................................8

   B.   The FCRA Establishes a Complex and Comprehensive Preemption Scheme. .......................................................................................13

   C.   Revised 56:11-34 Is Inconsistent with the FCRA........................................16

   D.   Revised 56:11-34 Seeks to Regulate Conduct Specifically Reserved to Federal Law and Is Preempted. ................................................20

II.    REVISED 56:11-34 INFRINGES ON THE NCRAS' RIGHT TO FREEDOM OF EXPRESSION, GUARANTEED BY THE FIRST AMENDMENT. ............................................................................28

CONCLUSION .....................................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Aetna Life Ins. Co. v. Haworth*,
    300 U.S. 227 (1937) ........................................................................................ 6

*Aleshire v. Harris*,
    586 Fed. Appx. 668 (7th Cir. 2013) .............................................................. 24

*Bates v. State Bar of Ariz.*,
    433 U.S. 350 (1977) ...................................................................................... 29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................ 4

*Central Hudson Gas & Electricity Corp. v. Public Service Commission of New York*,
    447 U.S. 557 (1980) ...................................................................................... 29

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) ...................................................................................... 22

*Coventry Health Care of Missouri v. Nevils*,
    137 S. Ct. 1190 (2017) .................................................................................. 27

*Dan's City Used Cars, Inc. v. Pelkey*,
    569 U.S. 251 (2013) ................................................................................ 21, 22

*FMC Corp. v. Holliday*,
    498 U.S. 52 (1990) ........................................................................................ 13

*Galper v. JP Morgan Chase*,
    802 F.3d 437 (2d Cir. 2015) ......................................................................... 21

*Gorum v. Sessoms*,
    561 F.3d 179 (3d Cir. 2009) ........................................................................... 4

*Greater Phila. Chamber of Com. v. City of Phila.*,
    949 F.3d 116 (3d Cir. 2020) .................................................................... 29, 30

*Consumer Data Industry Ass'n v. Frey*,
    No. 1:19-CV-00438-GZS, 2020 WL 5983881 (D. Me. Oct. 8, 2020) .............. 25

*Marshall v. Swift River Academy, LLC*,
   327 Fed. Appx. 13 (9th Cir. 2009) ..................................................... 25

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ........................................................................... 13

*Morales v. TWA*,
   504 U.S. 374 (1992) ........................................................................... 13

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................... 29

*Pinson v. Equifax Credit Info. Services, Inc.*,
   316 Fed. Appx. 744 (10th Cir. 2009) ............................................... 25

*Plains All Am. Pipeline L.P. v. Cook*,
   866 F.3d 534 (3d Cir. 2017) ............................................................... 5

*Premium Mortg. Corp. v. Equifax, Inc.*,
   583 F.3d 103 (2d Cir. 2009) ....................................................... 24, 25

*Purcell v. Bank of Am.*,
   659 F.3d 622 (7th Cir. 2011) ............................................................ 25

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017) ............................................................. 30

*Rowe v. New Hampshire Motor Transport Ass'n*,
   522 U.S. 364 (2008) .......................................................................... 24

*Salvation Army v. Department of Community Affairs*,
   919 F.2d 183 (3d Cir. 1990) ............................................................... 5

*Seattle Times Co. v. Rhinehard*,
   467 U.S. 20 (1984) ........................................................................... 28

*Sigler v. RBC Bank*,
   712 F. Supp. 2d 1265 (M.D. Ala. 2010) ........................................... 24

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................................... 28, 29, 30

*Step-Saver Data Systems, Inc. v. Wyse Technology*,
   912 F.2d 643 (3d Cir. 1990) .......................................................... 4, 5

*Travelers Ins. Co. v. Obusek*,
   72 F.3d 1148 (3d Cir. 1995) ............................................................ 4, 5

*Va. State Bd. of Pharma. v. Va. Citizens Consumer Council*,
   Inc., 425 U.S. 748 (1976) ............................................................ 29

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ............................................................ 28

## Statutes

10 M.R.S.A. § 1310-H ............................................................ 25

15 U.S.C. § 1681 ............................................................ 1, 7

15 U.S.C. § 1681a ............................................................ 2

15 U.S.C. § 1681a(g) ............................................................ 9

15 U.S.C. § 1681a(p) ............................................................ 8

15 U.S.C. § 1681(a) ............................................................ 7

15 U.S.C. § 1681c-1 ............................................................ *passim*

15 U.S.C. § 1681c(a) ............................................................ 26

15 U.S.C. § 1681e(b) ............................................................ 8

15 U.S.C. § 1681g ............................................................ 8, 18, 20, 21

15 U.S.C. § 1681g(a) ............................................................ 8, 9, 16

15 U.S.C. § 1681g(h)(8) ............................................................ 10

15 U.S.C. § 1681h ............................................................ 8, 10

15 U.S.C. § 1681i(a) ............................................................ 2, 3

15 U.S.C. § 1681i(b) ............................................................ 17

15 U.S.C. § 1681i(d) ............................................................ 21

15 U.S.C. § 1681j ............................................................ *passim*

15 U.S.C. § 1681j(a) ............................................................ 11, 16, 19, 20

15 U.S.C. § 1681j(a)(1)(B) ............................................................ 26

15 U.S.C. § 1681j(a)(2) ............................................................ 26

15 U.S.C. § 1681j(b)(d) ............................................................ 20

15 U.S.C. § 1681j(d) ............................................................ 21

15 U.S.C. §1681s-2 ............................................................ 25

15 U.S.C. § 1681t ............................................................................................ *passim*

15 U.S.C. § 1681t(a) ................................................................................ 15, 19, 20

15 U.S.C. § 1681t(b) ........................................................................................... 26

15 U.S.C. § 1681t(b)(a)(A) ................................................................................ 25

15 U.S.C. § 1681t(b)(1)(E) ................................................................................ 25

15 U.S.C. § 1681t(b)(1)(F) ................................................................... 21, 24, 25

15 U.S.C. § 1681t(b)(5) ............................................................................. *passim*

28 U.S.C. § 2201 ................................................................................................... 1

28 U.S.C. § 2202 ................................................................................................... 1

Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, 117 Stat.
1952 section 211 ...................................................................................... 2, 10, 11

## Rules

Fed. R. Civ. P. 56 ................................................................................................ 4

Fed. R. Civ. P. 57 ............................................................................................. 4, 6

## Other

12 C.F.R. § 1022.130 ......................................................................................... 19

*FTC Statement of Basis and Purpose*, 69 Fed. Reg. 35,468
(June 24, 2004) ......................................................................................... 2, 12, 20

79 Fed. Reg. 79,307 (Dec. 21, 2011) ................................................................ 19

N.J.S.A. 56:11-34 ..................................................................................... *passim*

N.J.S.A. 56:11-34(e) ................................................................................. *passim*

N.J.S.A. 56:11-37.10 ......................................................................................... 10

First Amendment to the United States Constitution .................................. 1, 4, 6, 32

Plaintiff Consumer Data Industry Association ("CDIA"), pursuant to this Court's scheduling orders dated May 3, 2021, and July 14, 2021, and in accordance with Federal Rule of Civil Procedure ("Fed. R. Civ. P") 56 and the Local Civil Rules for the District of New Jersey ("LCR"), submits this Memorandum of Law in support of its Motion for Summary Judgment and relief under the Declaratory Judgments Act, 28 U.S.C. §§2201, 2202.

## **INTRODUCTION**

CDIA seeks a declaratory judgment that the 2019 revision to the New Jersey Statutes, N.J.S.A. 56:11-34(e) ("Revised 56:11-34"), is preempted by the Fair Credit Reporting Act, 15. U.S.C. § 1681, *et seq.* ("FCRA"), and additionally, or in the alternative, for a declaratory judgment that Revised 56:11-34 violates the First Amendment to the United States Constitution.  In short, Revised 56:11-34 requires nationwide consumer reporting agencies ("NCRAs") to provide copies of their file disclosures on demand to consumers in <u>at least a dozen different languages</u> – *i.e.,* English, Spanish, and at least ten other languages to be determined by the Director of the Division of Consumer Affairs ("Director"), N.J.S.A. 56:11-34 - when the NCRAs only collect and maintain their U.S. data in English.[1]

---

[1]    Stipulated Facts for Purpose of Summary Judgment Motions ("Stipulated Facts") ¶ 8. Consistent with the Court's scheduling orders (*see* Dkt. Nos. 13 and 21), the parties submitted Stipulated Facts for Purpose of Summary Judgment Motions on January 15, 2021. (Dkt. No. 22.)  The Court accepted the parties' joint submission on January 19, 2021. (Dkt. No. 23).

In enacting the FCRA, Congress intended there to be a national credit reporting system to support the national banking system,[2] and adopted a complex framework to explicitly preempt state laws that were either inconsistent with the FCRA, or which would interfere with key elements of the national credit reporting system. *See gen.*, 15 U.S.C. § 1681t. Revised 56:11-34 is preempted because it is both inconsistent with the FCRA and is an impermissible regulation of a specially protected element of the national system – the preparation and delivery of certain consumer "file disclosures." 15 U.S.C. § 1681t(a) and § 1681t(b)(5)(E), respectively.

Not only did Congress explicitly preempt state regulation of the preparation and delivery of NCRA consumer file disclosures under FCRA section 1681i(a) generally, but it further required the Federal Trade Commission ("FTC") to enact regulations governing the manner in which in the NCRAs would prepare and deliver the file disclosures. Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, 117 Stat. 1952 ("FACT Act"), §211(d).   The FTC specifically considered whether to require these disclosures to be provided in languages other than English, and expressly declined to do so. *FTC Statement of Basis and Purpose*, 69 Fed. Reg. 35,468 at 35,476 (June 24, 2004).  Thus, a state law requiring NCRAs to provide file disclosures in multiple languages is inconsistent with the FCRA and

---

[2]   15 U.S.C. § 1681a ("Congressional findings and statement of purpose.")

its implementing regulations.  For these reasons, and as explained in detail below, Revised 56:11-34 is preempted by the FCRA.

Even if it were not inconsistent with the FCRA, Revised 56:11-34 is preempted because Congress expressly reserved to federal regulation the preparation and delivery of file disclosures by the NCRAs. 15 U.S.C. §§ 1681t(b)(5)(B) & (E). This broad "conduct preemption" provision preempts any state law "with respect to the conduct required by" specific sections of the FCRA, including section 1681i(a). Thus, all state laws that attempt to dictate how NCRAs provide file disclosures under 1681i(a), which Revised 56:11-34 attempts to do, are preempted.

Revised 56:11-34 also unlawfully infringes on the NCRAs' First Amendment rights because it arbitrarily and unduly burdens the NCRAs' right of free speech without advancing a substantial government interest.  Dictating that the NCRAs must affirmatively speak and provide services – in at least a dozen languages on demand – is a significant intrusion on their First Amendment rights. Moreover, New Jersey is unable to demonstrate a substantial government interest sufficient to justify this intrusion, especially since the legislature made no findings to support the revision, which gives nearly unfettered discretion to the Director to require the NCRAs to speak in an unlimited number of foreign languages.  As such, New Jersey has gone too far, and the law is unconstitutional.

For these reasons, this Court should grant the Motion and enter judgment in favor of CDIA.

## <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 56, the Court shall grant summary judgment if there is no genuine issue of material fact, and that party is entitled to judgment as a matter of law.  *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).  Based on the Stipulated Facts submitted by the parties and other material facts not in dispute,[3] CDIA is entitled to a declaratory judgment pursuant to Fed. R. Civ. P. 57 and the Declaratory Judgments Act, that Revised 56:11-34, N.J.S.A. 56:11-34(e), is preempted by the FCRA and violates the First Amendment to the United States Constitution.

This matter is ripe for adjudication and declaratory judgment is appropriate because CDIA can demonstrate the three factors which support their requests for declaratory relief. CDIA has established the "adversity of the interest" between the parties, the "conclusiveness" of the declaratory judgment sought, and "the practical help, or utility" of the requested declaratory judgment. *See Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995), *citing Step-Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643, 646 (3d Cir. 1990).

---

[3]  See Stipulated Facts, n. 1, supra, and CDIA's Statement of Material Facts Not in Dispute filed herewith.

"Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Plains All Am. Pipeline L.P. v. Cook,* 866 F.3d 534 (3d Cir. 2017), *quoting Travelers Ins*., 72 F.3d at 1154. The U.S. Supreme Court has pointed out "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007). Accordingly, "the party seeking review need not have suffered a completed harm to establish adversity" — it suffices that there is a "substantial threat of real harm and that the threat . . . remain real and immediate throughout the course of the litigation." *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994). CDIA's papers demonstrate the adversity of the parties' interests.

Next, a litigant, such as CDIA, may seek a declaratory judgment where the harm is threatened and demonstrates that the probability of that future event occurring is real and substantial, and is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Salvation Army v. Department of Community Affairs,* 919 F.2d 183, 192 (3d Cir. 1990). Here, the declaratory relief sought is conclusive. That is, the legal status of the parties, and/or their requirements will be changed or clarified by the declaration. *Step-Saver Data Systems, Inc.,* 912 F.2d at 648. The "contest must be based on a 'real and substantial controversy admitting of specific relief through a decree of a conclusive character, as

5

distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* at 649 (*quoting Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241 (1937)). CDIA has presented the Court with all relevant facts from which it can make such findings. A ruling by this Court would resolve the present controversy between the parties and provide certainty regarding the legal rights and obligations of the parties related to the NCRA's responsibilities of furnishing of consumer file disclosures as required by federal law.

## ARGUMENT

Revised 56:11-34 purports to require the NCRAs to provide file disclosures to consumers in no fewer than twelve languages. N.J.S.A. 56:11-34(e). In seeking to regulate the content and method of delivery of file disclosures, Revised 56:11-34 is both inconsistent with federal law and impermissibly seeks to regulate conduct that is reserved to federal law. Revised 56:11-34 accordingly is preempted by the FCRA. Further, because it seeks to compel speech without advancing a substantial governmental interest, Revised 56:11-34 violates the First Amendment to the United States Constitution. CDIA is entitled to a declaratory judgment pursuant to Fed. R. Civ. P. 57 and the Declaratory Judgments Act, that Revised 56:11-34 is preempted by the FCRA and further violates the First Amendment, as set forth more fully below.

## I.   REVISED 56:11-34 IS PREEMPTED BY THE FCRA.

The FCRA reflects a careful Congressional balancing of the "needs of commerce" and the "efficiency of the banking system" with the need to protect the privacy and accuracy interests of consumers in the information furnished to CRAs. 15 U.S.C. § 1681. In its statement of purpose in enacting the FCRA, Congress provided:

> (1)   The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
>
> (2)   An elaborate mechanism has been developed for investigating and evaluating the credit worthiness credit standing, credit capacity, character, and general reputation of consumers.
>
> (3)   Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
>
> (4)   There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a).  *See also* Stipulated Facts ¶ 6.  All consumer reporting agencies are subject to the FCRA, although there are certain provisions that apply only to those CRAs that meet the definition of a "nationwide consumer reporting agency"

set forth in section 1681a(p), including specific requirements related to file disclosures.

To promote these objectives, and to preserve a nationally uniform regulatory approach to consumer reports, Congress imposed upon consumer reporting agencies the obligation to "follow reasonable procedures to assure maximum possible accuracy of the information" that they include in consumer reports about an individual and to fulfill additional obligations, such as providing information to consumers, including file disclosures. 15 U.S.C. § 1681e(b). To maintain the integrity and uniformity of this system, Congress expressly preempted state action related to certain rights and obligations governed by the FCRA through a complex approach to preemption. 15 U.S.C. § 1681t.  A careful analysis of the preemptive effect of the FCRA clearly demonstrates that Revised 56:11-34 is preempted by federal law.

## A.    The FCRA Comprehensively Regulates the Provision of Consumer File Disclosures.

All consumer reporting agencies, regardless of size, must disclose to consumers, upon request, "clearly and accurately . . . all information in the consumer's file at the time of the request."  15 U.S.C. § 1681g(a).  Specifically, section 1681g provides:

(a)  Every consumer reporting agency shall, upon request, and subject to 610(a)(1) [§1681h], clearly and accurately disclose to the consumer:

8

(1)   All information in the consumer's file at the time
of the request . . . [with certain exceptions];

(2)   The sources of information . . . [with certain
exceptions].

(3)   Identification of each person (including each end-
user identified under section 607(e)(1)[§1681e]
that procured a consumer report [about the
consumer for stated periods of time, including the
name, address and telephone number of the person
if requested by the consumer, again with certain
exceptions].

(4)   The dates, original payees, and amounts of any
checks up on which is based any adverse
characterization of the consumer, included in the
file at the time of the disclosure.

(5)   A record of all inquiries received by the agency
during the 1-year period preceding the request that
identified the consumer in connection with a credit
or insurance transaction that was not initiated by
the consumer.

(6)   If the consumer requests the credit file and not the
credit score, a statement that the consumer may
request and obtain a credit score.

15 U.S.C. §1681g(a).  The term "file" when used in connection with information on

any consumer (as used above) means "all information on that consumer recorded

and retained by a consumer reporting agency regardless of how the information is

stored." 15 U.S.C. § 1681a(g) (emphasis added).

The FCRA also specifies the manner in which these disclosures must be made to consumers. Section 1681h, titled "Conditions and form of disclosure to consumers," sets forth the requirements for the provision of the file disclosure, including: (i) that the consumer reporting agency shall require the consumer to provide proper identification to receive the file disclosure; (ii) that the disclosure must be provided in writing, unless otherwise specified by the consumer; (iii) that the disclosure must take certain forms (in writing, in person, by telephone, by electronic means if available, or by any other reasonable means that is available from the agency); (iv) that the consumer reporting agency must provide trained personnel to explain the disclosure; and (v) that one other person is permitted to accompany the consumer to view the file disclosure, upon reasonable identification, when the file disclosure is provided in person. 15 U.S.C. §1681h. Except in certain circumstances as proscribed by law, consumer reporting agencies may charge consumers for a copy of their file disclosure. *See* 15 U.S.C. §1681g(h)(8).[4]

The NCRAs are subject to additional requirements. In 2003, Congress amended the FCRA as part of the Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, 117 Stat. 1952 ("FACT Act"), to add new consumer protections,

---

[4]  Section 1681t did grandfather certain state statutes with respect to the frequency of any disclosures, including N.J.S.A. 56:11-37.10(a)(1) as in effect as of the date of enactment of the FACT Act. That provision of New Jersey law essentially provided consumers with one free file disclosure from any type of CRA every 12-month period.

including providing for a new free annual file disclosure from the NCRAs to be provided through a "centralized source" to be established (and paid for) by the NCRAs. 15 U.S.C. §1681j(a). Congress set forth specific requirements for these new, free annual file disclosures:

(a)    Free Annual Disclosure

    (1)    Nationwide Consumer Reporting Agencies

        (A)    *In general*. All consumer reporting agencies described in subsections (p) and (w) of section 603 shall make all disclosures pursuant to section 609 once during any 12-month period upon request of the consumer and without charge to the consumer.

        (B)    *Centralized source*. Subparagraph (A) shall apply with respect to a consumer reporting agency described in section 603(p) only if the request from the consumer is made using the centralized source established for such purpose in accordance with section 211(c) of the Fair and Accurate Credit Transactions Act of 2003. . .

    (2)    *Timing*. A consumer reporting agency shall provide a consumer report under paragraph (1) not less than 15 days after the date on which the request is received under paragraph (1).

15 U.S.C. §1681j(a).

Congress also directed the FTC to adopt regulations that would govern the NCRA's conduct in providing the free annual file disclosures. FACT Act, §211(d)(1). In adopting the regulations, the FTC was required to "consider the

11

concerns of both consumer and industry in prescribing these rules," including the "significant demands that may be placed on consumer reporting agencies in providing such consumer reports."  FACT Act, §211(d)(2); *see also FTC Statement of Basis and Purpose*, 69 Fed. Reg. 35,468 (June 24, 2004).

In its rulemaking establishing the requirements for the centralized source, the FTC specifically considered the question of whether the NCRAs should be required to provide file disclosures in a language other than English. *See* 69 Fed. Reg. at 35476.   The FTC declined to do so, recognizing the substantial burden that the creation and maintenance of the centralized source already placed on NCRAs:

> Many consumer advocacy groups and a state official suggest that the centralized source be required to provide instructions in languages, other than English, that are spoken by a substantial number of consumers in the United States. These commenters point to the fact that a significant portion of the United States population communicates primarily in languages other than English. Having carefully considered these comments, the Commission has determined not to require instructions in other languages. The Commission believes that requiring multi-language translations of centralized source materials, including the centralized source website itself, would impose significant additional burden on the nationwide consumer reporting agencies at a time when they will already be responding to the multiple and varied new obligations that the FACT Act imposes upon them. Accordingly, the Commission declines, at this time, to require multi-language centralized source information and instructions.  The Commission, however, intends to provide education and outreach to consumers concerning the final rule in Spanish -- the language most commonly mentioned by commenters on this issue – and encourages

> other stakeholders in the centralized source, including the
> nationwide consumer reporting agencies, to do the same.

*Id.* at 35,476 (emphasis added).   As such, the FCRA, together with its implementing

regulations, only requires the NCRAs to provide file disclosures to consumers in

English.

**B.      The FCRA Establishes a Complex and Comprehensive Preemption
Scheme.**

The FCRA contains a number of provisions providing for preemption

of state laws.  As the Supreme Court has explained "[p]re-emption may be either

express or implied and is compelled whether Congress' command is explicitly stated

in the statute's language or implicitly contained in its structure and purpose."

*Morales v. TWA*, 504 U.S. 374, 383 (1992), *quoting FMC Corp. v. Holliday*, 498

U.S. 52, 56-57 (1990).  "The question, at bottom, is one of statutory intent, and we

accordingly "'begin with the language employed by Congress and the assumption

that the ordinary meaning of that language accurately expresses the legislative

purpose.'" 504 U.S. at 383 (citations omitted).  Moreover, where necessary, courts

should consider the "structure and purpose of the statute as a whole," as revealed not

only in the text, but through the reviewing court's reasoned understanding of the

way in which Congress intended the statute and its surrounding regulatory scheme

to affect business, consumers, and the law.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

486 (1996) (internal citations omitted).

The initial version of the FCRA contained only a "conflict preemption" provision, essentially only preempting those state laws that were inconsistent with the FCRA. Pub. L. 90-321 (1968). However, Congress substantially amended the FCRA in 1996 (the Consumer Credit Reform Act), adding additional bases for federal preemption of state laws, creating the complex preemption framework we have in place today. Pub. L. No. 104-208 (1996). With regard to the expansion of the preemption framework, Representative Thomas of Wyoming explained "…we have compromised on the preemption issue <u>so companies will not have to comply with a patchwork of state laws</u>." 140 Cong. Rec. H9797-05, H9811 (1994) (emphasis added). As Representative Castle of Delaware put it, "[t]his Federal preemption <u>will allow businesses to comply with one law on credit reports rather than a myriad of State laws</u>." 140 Cong. Rec. H9797-05, H9815 (1994) (emphasis added).

The 1996 version of section 1681t included an eight-year sunset provision of this comprehensive framework, which sunset Congress removed in the 2003 FACT Act amendments to make the preemption framework permanent. Congress also preempted state laws relating to many of the FACT Act amendments. Pub. L. No. 108-159, 149 Cong. Rec. H8122 (2003). As Representative Oxley explained, the intent of Congress at that time was that:

> under this new preemption provision, <u>no state or local jurisdiction may add to, alter, or affect the rules established by the statute or regulations</u>

14

thereunder in any of these areas. All of the statutory and regulatory provisions establishing rules and requirements governing the conduct of any person in the specified areas are governed solely by federal law, and any state action that attempts to impose requirements or prohibitions in these areas would be preempted.

149 Cong. Rec. E2512 & P 2518 (2003) (emphasis added).

The FCRA now contains three principal forms of preemption, namely "conflict preemption," "subject matter preemption," and "conduct preemption." Under the "conflict preemption" rule set forth in 1681t(a), state laws that are inconsistent with *any provision* of the FCRA are preempted. 15 U.S.C. §1681t(a). Written as a savings clause, it provides:

> Except as provided in subsections (b) and (c), this title does not annul, alter, affect, or exempt any person subject to the provisions of this title from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, or for the prevention or mitigation of identity theft, except to the extent that those laws are inconsistent with any provision of this title, and then only to the extent of the inconsistency.

*Id.* (emphasis added).

The "subject matter preemption" provision provides "[n]o requirement or prohibition may be imposed under the laws of any State…with respect to any subject matter regulated under" certain enumerated provisions of the FCRA. Thus, state laws that attempt to regulate one of these subject matters in any way are preempted. Congress also expressly preempted state laws that attempted to regulate

15

specific conduct dictated by the FCRA.  Relevant here, the "conduct preemption" provision states:

> No requirement or prohibition may be imposed under the laws of any State --…<u>with respect to the conduct required</u> by the specific provisions of – …
>
> (B) Section 1681c-1 (titled "Identity theft prevention; fraud alerts and active-duty alerts [15 U.S.C. § 1681c-1]); . . .
> (E) Section 1681j(a) (titled "Charges for certain disclosures [15 U.S.C. § 1681j]); . . .

15 U.S.C. § 1681t(b)(5) (emphasis added).  In this case, both conflict preemption and conduct preemption operate to preempt Revised 56:11-34.

## C.      Revised 56:11-34 Is Inconsistent with the FCRA.

As detailed above, NCRAs must clearly and accurately disclose to the consumer "all information in the consumer's file at the time of the request." 15 U.S.G. § 1681g(a).  The definition of "file" also includes <u>how</u> the information is recorded, retained, and stored. 15 U.S.C. § 1681g(a).  As revised, New Jersey law now requires NCRAs to make these disclosures "available to a consumer upon the consumer's request in Spanish or any other language that the Director of the Division of Consumer Affairs determines is the first language of a significant number of consumers in the State."   N.J.S.A. 56:11-34(e).  The Director is directed to require that the information be "made available in at least the 10 languages other than English and Spanish that are most frequently spoken as a first language by

consumers in this State." *Id.* It is impossible for any NCRA to comply with both the FCRA requirement and Revised 56:11-34's requirement to provide disclosures in real time <u>in at least eleven additional</u> languages when they exclusively collect, maintain, and report such information in English, as explained more fully below.

Each year, the NCRAs receive millions of reported accounts and other information (known as "tradelines") from over 10,000 qualified and credentialed data furnishers, which are entities across the country that have relationships with consumers, such as creditors and landlords, for the purpose of providing that information in a consumer report. CDIA's Statement of Material Facts Not in Dispute ("CDIA Statement") ¶8. The tradeline data are provided by these furnishers in English using a specific industry standard format ("Metro 2® format"), which format establishes the rules related to the reporting this information to NCRAs. Id. at ¶9. None of these sources of tradeline data provide information in Spanish, or any other language. *Id.* ¶12. All U.S. file information is maintained and reported in English. Stipulated Facts ¶8; CDIA Statement ¶¶ 10, 12.

"File information" may also include personal statements that are written by consumers and submitted to a consumer reporting agency for the purpose of explaining a dispute of information in their file. 15 U.S.C. § 1681i(b). These consumer statements are provided and maintained in English. CDIA Statement ¶11. Moreover, should a consumer report that they are the victim of identity theft or fraud,

the NCRA records a "fraud alert" which is included in all subsequent consumer reports it provides to users.  15 U.S.C. § 1681c-1.  These fraud alerts, and other alerts, such as active-duty alerts (advising that the consumer is active duty military and subject to additional protections under the law), are also part of the consumer's file and maintained in English.  CDIA Statement ¶11.

New Jersey's requirement to provide file disclosures in multiple languages other than English necessarily means that an NCRA will no longer be providing the consumer with a disclosure of the information "in the consumer's file" under the FCRA, but a <u>translation</u> or other <u>interpretation</u> of its file information.  The FCRA, however, requires the NCRAs to disclose "all of the information in the consumer's file at the time of the request" when a request is made; there is no separate law allowing for a different form of a file disclosure to be requested pursuant to state law.  Any request for a file disclosure necessarily triggers the FCRA requirements in section 1681g and section 1681j.  The NCRAs cannot comply with both requirements simultaneously – if a file disclosure is required, the FCRA requires that the NCRA disclose the information in the file, i.e., the information that is stored in English.  If an NCRA must provide the information in Spanish or another language, as required by Revised 56:11-34, it is not providing the information in

"the file," thus risking a violation of the FCRA.[5]  Because an NCRA cannot comply with the FCRA's requirement to provide a disclosure of the information in the file (which is in English) and New Jersey's requirement that NCRAs provide a disclosure in a language other than the one in which the file is maintained, Revised 56:11-34 is preempted.

Revised 56:11-34 is also inconsistent with, and thus also preempted under, section 1681t(a) because the very question as to whether the NCRAs should provide disclosures in languages other than English has already been considered and decided by the federal agency delegated with the responsibility of establishing the rules governing the NCRA's conduct in this regard. As discussed above, Congress directed the FTC to adopt regulations governing the preparation and delivery of file disclosures by the NCRAs pursuant to § 1681j(a), and the FTC timely promulgated the regulations. 12 C.F.R. § 1022.130.[6]

In its rulemaking, the FTC specifically considered whether to require NCRAs to provide instructions relating to access to file disclosures and the

---

[5]  Notably, Revised 56:11-34 specifically requires that the file disclosure be made in certain specified languages, not that the NCRAs provide the consumer with translation services for their file disclosures.

[6]  Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law No. 111-203, 124 Stat. 1376, this authority moved from the FTC to the Consumer Financial Protection Bureau, which republished the rule in its entirety without change. *See* 79 Fed. Reg. 79,307 (Dec. 21, 2011).

disclosures themselves in languages other than English, and it declined to do so, concluding "the Commission declines, at this time, to require multi-language centralized source information and instructions." *FTC Statement of Basis and Purpose*, 69 Fed. Reg. 35468 (2004) (emphasis added). Congress having delegated this authority to the FTC and preempting any state law "with respect to the conduct required by" the FCRA related to the preparation and delivery of file disclosures, states may not for themselves require file disclosures to be provided in multiple languages. Therefore, Revised 56:11-34 is preempted under 15 U.S.C. § 1681t(a).

**D.    Revised 56:11-34 Seeks to Regulate Conduct Specifically Reserved to Federal Law and Is Preempted.**

As discussed above, the FCRA provides that:

No requirement or prohibition may be imposed under the laws of any State --…with respect to the conduct required by the specific provisions of – …

(B) Section 1681c-1; . . .
(E) Section 1681j(a); . . .

15 U.S.C. § 1681t(b)(5). Section 1681j(a) requires, among other things, that NCRAs must "make all disclosures pursuant to Section 1681g during any 12-month period upon request of the consumer and without charge to the consumer" and dictates how and when these disclosures must be provided. 15 U.S.C. § 1681j(a). Sections 1681j(b) – (d) require the NCRAs to give consumers additional free disclosures under certain circumstances.

Sections 1681c-1 and 1681i(d) require NCRAs to provide consumers free file disclosures following placement of a fraud alert.  Specifically, NCRAs that include a fraud alert in the file of the consumer shall:

> (A) disclose to the consumer that the consumer may request a free copy of the file of the consumer pursuant to Section 1681j(d) of this title; and

> (B) provide to the consumer all disclosures required to be made under Section 1681g of this title, without charge to the consumer, not later than 3 business days after any request described in [Section 1681c-1(a)(2)(A)].[7]

In applying conduct preemption, it is important to understand that the phrase "with respect to" – which is used in the conduct preemption provision – has been construed to mean "concerning."  *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013).  "With respect to" has also been held to be synonymous with "relating to" for the purpose of a preemption analysis. *Galper v. JP Morgan Chase*, 802 F.3d 437, 446 (2d Cir. 2015) (finding that "with respect to" is synonymous with "relating to" and holding that section 1681t(b)(1)(F) preempts "those claims that *concern* the furnisher's responsibilities"). The Supreme Court has made clear that the phrase "related to" has a "broad scope," and "an expansive

---

[7]   15 U.S.C. § 1681j(d) states "…[NCRAs] shall make all disclosures pursuant to section 1681g without charge to the consumer, as provided in subsections (a)(2) and (b)(2) of section 1681c-1, as applicable."

sweep," noting it is "deliberately expansive," "broadly worded," and "conspicuous for its breadth." *Dan's City Used Cars*, 569 U.S. at 261 (internal citations omitted). As the Supreme Court explained:

> The ordinary meaning of these words is a broad one — "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with," Black's Law Dictionary 1158 (5th ed. 1979) — and the words thus express a broad preemptive purpose.

*Id.* (emphasis added). This language means that state laws "having a connection with or reference to" the protected subject matters (rates, routes, or services) were therefore preempted. *Id.* at 2037 (emphasis added). Similarly, therefore, section 1681t(b)(5)(B) and (E) were intended to be broadly applied, and preempt any requirements that "concern," "pertain," or "refer" to the preparation and delivery of file disclosures– as Revised 56:11-34 attempts to do here.[8]

By the time the FCRA amendments in 1996 were enacted, the Supreme Court had already considered the broad preemptive effect of nearly identical statutory text used in another consumer protection statute - the Public Health Cigarette Smoking Act of 1969 (the "PHCSA"). *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). In *Cipollone*, the question before the Supreme Court was whether and to what extent, the PHCSA preempted state law claims. The court

---

[8]  Note that under section 1681t(b), the state law need not be in conflict with the FCRA requirement; instead, <u>any</u> attempt to regulate the same conduct is proscribed.

22

considered the text of the 1969 amendments, which read: "(b) <u>No requirement or prohibition</u> based on smoking and health <u>shall be imposed under State law with respect to</u> the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Id.* at 513 (emphasis added). The Supreme Court held that this language, on its face, evidenced Congress' clear intent to preempt state law:

> When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," . . . "there is no need to infer congressional intent to preempt state laws from the substantive provisions" of the legislation.

*Id.* at 518. In comparing the initial and amended preemption provisions of the law, the Supreme Court explained:

> We must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning. . . . In this case there is no "good reason to believe" that Congress meant less than what it said; indeed, in light of the narrowness of the 1965 Act, there is "good reason to believe" that Congress meant precisely what it said in amending that Act.

*Id.* at 521-22 (citations omitted).

It is axiomatic that, "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial

interpretations as well." *Rowe v. New Hampshire Motor Transport Ass'n*, 522 U.S. 364, 369 (2008) (citations omitted).  As such, Congress is presumed to have understood how such a preemption framework would be interpreted, and thus fully intended to broadly preempt all state laws that attempt to regulate conduct that it decided should be exclusively regulated by the FCRA in the enumerated subsections of section 1681t(b).

Since the adoption of this comprehensive federal preemption framework, several circuit courts have held that that the phrases "relating to" and "with respect to" in a preemption clause have a broad preemptive effect.  While no case has interpreted 1681t(b)(5)(B) & (E) particularly, cases have examined section 1681t(b)(1), finding clear legislative intent to preempt state laws that 'concern' or 'refer' or 'relate to' the subject matters enumerated in subpart (b)(1).  *See Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103 (2d Cir. 2009) (finding §1681t(b)(1)(F) preempted state law tort claim relating to the furnishing of information); *Aleshire v. Harris*, 586 Fed. Appx. 668, *6 (7th Cir. 2013) ("we recently rejected the argument that section 1681t(b) should be read narrowly to apply only to state statutory claims, and we held that section 1681t(b)'s preemptive force applies equally to state common law claims"); *Sigler v. RBC Bank*, 712 F. Supp. 2d 1265, 1269 (M.D. Ala. 2010) (referring to subject matter preemption as an "absolute immunity provision" and declaring state law preempted where the allegations all related to "prescreening

of consumer reports" under §1681t(b)(a)(A)); *Pinson v. Equifax Credit Info. Services, Inc.*, 316 Fed. Appx. 744 (10th Cir. 2009) (unpublished opinion) (state law claims barred by 15 U.S.C. §1681t(b)(1)(F)); and *Marshall v. Swift River Academy, LLC*, 327 Fed. Appx. 13 (9th Cir. 2009) (unpublished opinion) (state law claims barred by 15 U.S.C. § 1681t(b)(1)(F)); *Purcell v. Bank of Am.*, 659 F.3d 622, 625 (7th Cir. 2011) (finding claims related to inaccurate furnishing of data preempted by 1681t(b)(1)(F) stating "[the] extra federal remedy in §1681s-2 was accompanied by extra preemption in §1681t(b)(1)(F), in order to implement the new plan under which reporting to credit agencies would be supervised by state and federal administrative agencies rather than judges.") (relying on *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103 (2d Cir. 2009)).

In another 2019 case filed by CDIA, the District of Maine found that section 1681t(b)(1)(E) (which preempts state laws attempting to regulate the content of consumer reports) preempted two Maine laws that attempted to regulate whether and how medical account and other information could be included in consumer reports in Maine.[9] *See Consumer Data Industry Ass'n v. Frey*, No. 1:19-CV-00438-GZS, 2020 WL 5983881 (D. Me. Oct. 8, 2020), No.20-2064, *argued* (1st Cir. June

---

[9] Maine's Medical Bill Act attempted to exclude the reporting of unpaid medical accounts that were less than 180 days old, and any medical accounts that had previously been reported as delinquent but were later paid. 10 M.R.S.A. § 1310-H(4). It also attempted to dictate how accounts on which payments were being made should be reported. *Id.*

9, 2021).    The district court carefully studied the evolution of the FCRA text, discussed principles of federal preemption, and found that the result of the 1996 Amendments to the FCRA was that "§ 1681t(b)(1) now presents a list of eleven 'subject matter[s]' 'regulated under' other sections of the FCRA that are reserved to the federal government."    *Id.* * 8 ("…the amended language and structure of section 1681c(a) and section 1681t(b) reflect an affirmative choice by Congress to set "uniform federal standards" regarding the information contained in consumer credit reports.").    Similarly, here, section 1681t(b)(5) presents a list of nine obligations consumer reporting agencies must satisfy that must remain the subject of exclusive federal regulation.

Revised 56:11-34 requires NCRAs providing file disclosures to consumers to provide file disclosures "…upon the consumer's request in Spanish or any other language that the Director of the Division of Consumer Affairs determines is the first language of a significant number of consumers in the State."    N.J.S.A. 56:11-34(e). But the FCRA expressly governs <u>what</u> must be included in a file disclosure, <u>how</u> the NCRAs must permit requests of those free annual file disclosures, and <u>when</u> the free annual file disclosures must be provided. 15 U.S.C. § 1681j(a)(1)(B) and § 1681j(a)(2), respectively. *See also* 15 U.S.C. § 1681c-1 (requiring NCRAs to provide file disclosures to fraud victims within three business days of certain events).  These federal rules regarding "what", "how", and "when"

necessarily dictate the NCRA's conduct.  By requiring NCRAs to translate the information in their files, Revised 56:11-34 necessarily imposes new conduct requirements regarding "what" and "how" –thereby impermissibly attempting to regulate "with respect to the conduct required" of the NCRAs by the specified FCRA provisions. As a result, these requirements fall squarely within the scope of activities that Congress preempted.

This case does not require the Court to consider the outer boundaries of conduct preemption, because Revised 56:11-34 has far more than "a connection with" the required conduct, or a mere "reference to" the FCRA-enumerated requirements. *See Coventry Health Care of Missouri v. Nevils*, 137 S. Ct. 1190, 1197 (2017).  Instead, it attempts to direct both the <u>how</u> and the <u>what</u> NCRAs must provide when preparing a file disclosure for a New Jersey resident.

In sum, Congress established "uniform federal standards" regarding the preparation and delivery of file disclosures and expressly provided that no state may impose requirements regarding the provision of those disclosures.  There is no "good reason to believe" that Congress meant anything other than it said in section 1681t(b)(5): states may not pass laws "relating to" or "concerning" how and when file disclosures must be provided to consumers, or "what" information should be contained within them.  Thus, the FCRA preempts Revised 56:11-34.

## II. REVISED 56:11-34 INFRINGES ON THE NCRAS' RIGHT TO FREEDOM OF EXPRESSION, GUARANTEED BY THE FIRST AMENDMENT.

Revised 56:11-34 impermissibly burdens NCRAs' rights to free expression under the First Amendment. Revised 56:11-34 would materially modify the existing file disclosure rules, essentially compelling the NCRAs to speak in multiple languages on demand the do not currently "speak" today, without meaningfully advancing any relevant stated government interests.

"We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The Supreme Court has clearly held that the "right to speak is implicated when information [one] possesses is subjected to restrains on the way in which the information might be used or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (quoting *Seattle Times Co. v. Rhinehard*, 467 U.S. 20, 32 (1984)). Forcing the NCRAs to "speak" in multiple foreign languages, on demand, is an infringement on the rights of each NCRA. Moreover, the state has not demonstrated any lawful justification for imposing these significant intrusions on private citizens.

This type of forced speech should be examined under a "heightened scrutiny" standard because it is targeted at a particular group of speakers, namely,

the NCRAs. *See Sorrell*, 564 U.S. at 572-73 (content and speaker-based restrictions on speech are entitled to heightened scrutiny).  In addition, the Supreme Court has long recognized that heightened scrutiny should be applied to restrictions on truthful, accurate and non-misleading information, even if that information is furnished through speech made for a commercial purpose.  *See, e.g., Va. State Bd. of Pharma. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 773 (1976); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265-66 (1964).  Indeed, as the Supreme Court has repeatedly stated, "a 'consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue.'"  *Sorrell*, 564 U.S. at 566, *quoting Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977).  Just as in *Sorrell*, Revised 56:11-34 imposes speaker-and-content related restrictions, and the Court should apply heightened judicial scrutiny to the law.

Even if the Court applies intermediate scrutiny, Revised 56:11-34 must fail. Under the intermediate scrutiny test, the court must determine whether: (1) the speech concerns lawful activity and is not misleading; (2) the asserted governmental interest is substantial; (3) the regulation directly advances the governmental interest asserted; and (4) "whether it is not more extensive than is necessary to serve that interest."  *Greater Phila, Chamber*, 949 F.3d at 140, *citing Central Hudson Gas & Electricity Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). The fourth prong of the test - whether the suppression of speech ordinarily protected

by the First Amendment is <u>no more extensive than necessary</u> to further the substantial government interest – is the "critical" inquiry.  *Sorrell*, 447 U.S. at 569-70; *Greater Phila. Chamber*, 949 F.3d at 138 (emphasis added).

Once the moving party makes a colorable claim that the law restricts some form of speech, the government then bears the ultimate burden "to justify its restriction on speech under whatever level of scrutiny is appropriate (intermediate or strict) given the restriction in question."  *Greater Phila. Chamber*, 949 F.3d at 133-34 (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)).  Based upon the submitted Stipulated Facts, it is clear that Revised 56:11-34 restricts the freedom of speech of Plaintiff's members by dictating the manner in which they must speak. The burden therefore shifts to New Jersey to justify its restriction, which it cannot do.

In this case, Revised 56:11-34 fails under either a heightened judicial scrutiny or intermediate scrutiny standard.  New Jersey arbitrarily decided to require federally required disclosures to be made available in eleven or more languages, in addition to English, without stating any legal or factual basis for imposing the requirement that the federal government deliberately chose not to require.  Revised 56:11-34 does not (a) articulate any substantial government interest that the language requirement is intended to promote, (b) contain any other statement explaining its purpose, or (c) reflect legislative findings that could support the

conclusion that the FCRA and supporting federal regulations are insufficient to protect the interests of consumers in New Jersey. N.J.S.A. 56:11-34; *see also* 2018 New Jersey Senate Bill No. 3452.

On its face, Revised 56:11-34 is clearly not "narrowly" drawn to achieve any government interest. Revised 56:11-34 makes no attempt to determine the scope of the problem and tailor the remedy accordingly. Revised 56:11-34, for example, does not require that the Director assess whether consumers whose first language is other than English also can speak or read English well. Neither does Revised 56:11-34 set forth any explanation for its selection of at least eleven new languages, nor establish any population threshold for affected consumers.

Revised 56:11-34 compels the NCRAs to produce disclosures in at least eleven new languages other than the language in which it conducts its business on a daily basis. Revised 56:11-34 is not narrowly tailored to achieve any government interest, and thus impermissibly infringes upon the rights of the three NCRAs and is unconstitutional.

## **CONCLUSION**

For the foregoing reasons, the Consumer Data Industry Association respectfully requests that this Court (1) find that the amendment to Revised 56:11-34, codified at N.J.S.A. 56:11-34(e), which became effective October 17, 2019, (a) is preempted by the Fair Credit Reporting Act §§1681t(a) and 1681t(b)(1)(5)(B) &

(E), and (b) violates the freedom expression guaranteed to the Consumer Data Industry Association's members by the First Amendment to the United States Constitution, and (2) accordingly enter judgment in favor of the Consumer Data Industry Association on its Verified Complaint.

Dated:  January 21, 2022

Respectfully submitted,

*/s/ William T. Marshall, Jr.*
William T. Marshall, Jr.
(N.J. Bar No. WM0626)
ZEICHNER ELLMAN & KRAUSE LLP
33 Wood Avenue South, Suite 110
Iselin, New Jersey 08830
Phone: (973) 618-9100
Fax: (973) 364-9960
wmarshall@zeklaw.com

Rebecca E. Kuehn (*pro hac vice*)
Jennifer L. Sarvadi (*pro hac vice*)
HUDSON COOK, LLP
1909 K Street NW
4th Floor
Washington, DC 20006
Phone: (202) 715-2008
Facsimile: (202) 223-6935
rkuehn@hudco.com
jsarvadi@hudco.com

Attorneys for Plaintiff
Consumer Data Industry Association

4855-9966-5418, v. 1