**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CONSUMER DATA INDUSTRY ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW J. PLATKIN, in his official capacity as ATTORNEY GENERAL FOR THE STATE OF NEW JERSEY,<br><br>Defendant. | Civil Action No. 19-19054 (GC) (TJB)<br><br>**OPINION** |

**APPEARANCES**

William T. Marshall, Jr.
Kerry A. Duffy
ZEICHNER ELLMAN & KRAUSE LLP
33 Wood Avenue South, Suite 110
Iselin, New Jersey 08830

Jennifer L. Sarvadi (*pro hac vice*)
Rebecca E. Kuehn (*pro hac vice*)
HUDSON COOK LLP
1909 K Street NW, 4th Floor
Washington, District of Columbia 20006

     *On behalf of Plaintiff*

Olga Elaine Bradford,
*Deputy Attorney General*
Tim Sheehan,
*Special Assistant to the Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF NEW JERSEY
124 Halsey Street, Fifth Floor
P.O. Box 45029
Newark, New Jersey 07101

     *On behalf of Defendant*

Jeremiah Battle, Jr.
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, Massachusetts 02210

     *On behalf of Amicus*
     *National Consumer Law Center*

**CASTNER, U.S.D.J.**

The issue in this case is whether the State of New Jersey can require nationwide consumer reporting agencies to provide New Jersey consumers with the credit file disclosures mandated by the federal Fair Credit Reporting Act in twelve or more languages.

The Consumer Data Industry Association, an international trade association whose membership includes the three nationwide consumer reporting agencies (Equifax, Experian, and TransUnion), submits that the answer is no—that requiring the disclosures in any language other than English is preempted by federal law and, even if not preempted, infringes upon its members' commercial speech rights under the First Amendment.

New Jersey disagrees, insisting that the New Jersey Legislature acted in harmony with federal law as well as the First Amendment when, in 2019, it amended the New Jersey Fair Credit Reporting Act to enable New Jersey consumers to request the disclosures in English, Spanish, or one of at least ten other languages.

The parties briefed dueling motions for summary judgment, and the Court heard oral argument on November 14, 2023. The Court then allowed limited post-argument briefing. Having carefully considered the parties' submissions, and for the reasons set forth below, the Court finds that the 2019 amendment to the New Jersey Fair Credit Reporting Act is not preempted by federal law. The State may require credit file disclosures to be provided to New Jersey consumers in languages other than English without coming into conflict with the federal Fair Credit Reporting Act. The State may also require credit file disclosures to be translated into Spanish without implicating any First Amendment concerns. However, on the record currently before the Court, requiring the disclosures to be made available to consumers in *at least* ten languages (in addition to Spanish) has not been shown to be reasonably related to the State's interest in preventing consumer confusion. The Court therefore concludes that this particular provision impermissibly

infringes on nationwide consumer reporting agencies' commercial speech rights.  Rather than invalidate the entire statute, the Court will sever the provision that mandates that credit file disclosures be provided in at least ten languages.  The remainder of the statute is unaffected, and the State may proceed to promulgate regulations to implement it, including determining which languages are appropriate consistent with this Opinion.

Accordingly, Defendant's Motion for Summary Judgment (ECF No. 58) is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion for Summary Judgment (ECF No. 59) is **GRANTED** in part and **DENIED** in part.

I.    **BACKGROUND**

A. **PROCEDURAL BACKGROUND**[1]

On October 17, 2019, the day that the 2019 amendment to the New Jersey Fair Credit Reporting Act (NJFCRA), N.J. Stat. Ann. § 56:11-28, *et seq.*, was to become effective, Plaintiff Consumer Data Industry Association (CDIA) filed a Verified Complaint for Declaratory Judgment and Injunctive Relief.  (ECF No. 1.[2])  The Complaint claims that the amendment is preempted by the federal Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.*, and violates the commercial speech rights of nationwide consumer reporting agencies under the First Amendment to the United States Constitution.

On February 14, 2020, Defendant the Attorney General of the State of New Jersey answered and asserted affirmative defenses.[3]  (ECF No. 7.)  The parties then engaged in discovery.

---

[1]    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

[2]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[3]    The Complaint named then-Attorney General Gurbir S. Grewal, in his official capacity, as Defendant.  (ECF No. 1.)  The parties agreed to substitute in the name of the current Attorney General, Matthew J. Platkin.  (ECF No. 49.)

On January 19, 2021, the Court accepted the parties' stipulated facts for the purpose of summary judgment motions.  (ECF No. 23.)

On March 1, 2022, the Court directed the parties to prepare and serve their summary judgment motions on each other and to bundle and submit their papers (including their respective oppositions and replies) by April 1, 2022.  (ECF No. 51.)  The Court also granted the National Consumer Law Center (NCLC) leave to file an *amicus curiae* brief.  (ECF No. 52.)  At the request of the parties, the motion deadline was extended.  (ECF No. 56.)  The parties then formally cross-moved for summary judgment.  (ECF Nos. 58 & 59.)  The matter was reassigned to the undersigned on April 11, 2022.  (ECF No. 57.)

After briefing was complete, New Jersey filed a two-page notice of supplemental authority, asking the Court to take notice of an interpretive rule issued by the Consumer Financial Protection Bureau (CFPB), titled "The Fair Credit Reporting Act's Limited Preemption of State Laws."  (ECF No. 63.)  On July 8, 2022, CDIA filed a responsive letter that asked the Court to either disregard the interpretive rule or to grant CDIA an opportunity to file a memorandum in response.  (ECF No. 65.)  The Court allowed the parties to each submit letter briefs on the issue, and the period for them to do so was extended at their request.  (ECF Nos. 68, 70, 74.)  The Court held oral argument on November 14, 2023. (ECF No. 81.)  Following argument, the parties submitted supplemental briefing on standing and the appropriate level of scrutiny to apply to the First Amendment challenge.  (ECF Nos. 82 & 83.)

B. FACTUAL BACKGROUND[4]

CDIA is an international trade association that represents the three nationwide consumer reporting agencies: Experian, Equifax, and TransUnion (together, the NCRAs).[5]  (ECF No. 23 ¶ 1.)  The NCRAs invested "significant resources" in creating systems "to serve consumers" and to assist them "in understanding their credit reports and legal rights."  (ECF No. 59-2 ¶ 5.) Information furnished to the NCRAs in the United States "is provided on [specialized] forms in English."  (*Id.* ¶ 10.)  And the NCRAs record consumer credit information in the United States only in English.  (ECF No. 23 ¶ 8.)

The New Jersey Legislature amended the NJFCRA in July 2019 to require the NCRAs to provide, upon request, credit file disclosures to New Jersey consumers in certain languages other than English.[6]  (*Id.* ¶¶ 10, 13.)  The amendment grants the Director of New Jersey's Division of Consumer Affairs (DCA) discretion to determine the languages other than English and Spanish

---

[4]    The material facts are not in dispute and were stipulated to by the parties.

[5]    The NCRAs are also known as "the 'Big Three' credit reporting agencies."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 419 (2021).  They "compile[] personal and financial information about individual consumers to create consumer reports.  [They] then sell[] those consumer reports for use by entities such as banks, landlords, and car dealerships that request information about the creditworthiness of individual consumers."  *Id.*  "Credit reporting agencies" are referred to in the FCRA as "consumer reporting agencies."  *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015).

[6]    A "consumer file disclosure" or "credit file disclosure" is "the document provided to a consumer who seeks access to his [or her] credit information from a credit reporting agency."  *Eller v. Experian Info. Sols., Inc.*, Civ. No. 09-00040, 2011 WL 3365955, at *20 n.9 (D. Colo. May 17, 2011), *report and recommendation adopted*, 2011 WL 3365513 (D. Colo. Aug. 4, 2011).  A "consumer report" or "credit report" is the "report of credit information" given to a third-party "for the purpose of evaluating a consumer's credit."  *Id.*; *see also Alexander v. Equifax Info. Servs., LLC*, Civ. No. 17-00139, 2018 WL 3025939, at *1 n.2 (D. Nev. June 15, 2018) ("A consumer file disclosure or consumer credit disclosure refers to the document [N]CRAs provide to consumers seeking access to their own credit information directly from the [N]CRA.  A consumer report or credit report refers to the document provided by [N]CRAs to third party creditors, insurers, or employers.").  In this case, the parties use the terms interchangeably at times, and both terms are used here to refer to the credit file disclosures provided to consumers.

that the disclosures will be made in. (*Id.* ¶¶ 10-11 (citing N.J. Stat. Ann. § 56:11-34(e)).) To date, the Director has not proposed or adopted regulations or rules to implement the 2019 amendment to the NJFCRA nor has the Director acted to compel the NCRAs to comply with the amendment.[7] (*Id.* ¶¶ 14-16.)

New Jersey's Attorney General "is charged with enforcing the laws of the State." (ECF No. 39 ¶ 2; ECF No. 60-1 ¶ 2.) The Attorney General "or his designees have authority to investigate suspected non-compliance, file a civil action to seek enforcement, and request civil penalties for noncompliance" under the NJFCRA. (ECF No. 39 ¶ 4; ECF No. 60-1 ¶ 4.)

## II. LEGISLATIVE BACKGROUND

### A. FEDERAL FAIR CREDIT REPORTING ACT

"Enacted long before the advent of the Internet," the Fair Credit Reporting Act "seeks to ensure 'fair and accurate credit reporting.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334-35 (2016), *as revised* (May 24, 2016) (quoting 15 U.S.C. § 1681(a)(1)). "To achieve this end, the Act regulates the creation and the use of 'consumer report[s]' by 'consumer reporting agenc[ies],'" and it "imposes a host of requirements concerning the creation and use of consumer reports." *Id.* (quoting 15 U.S.C. § 1681a(d)(1)(A)-(C)).[8] It also enables consumers to sue and recover damages

---

[7]      Counsel for the State represented at oral argument that it is close to proposing regulations.

[8]      For example, "the Act requires consumer reporting agencies to 'follow reasonable procedures to assure maximum possible accuracy' in consumer reports"; "provides that consumer reporting agencies must, upon request, disclose to the consumer '[a]ll information in the consumer's file at the time of the request'"; and "compels consumer reporting agencies to 'provide to a consumer, with each written disclosure by the agency to the consumer,' a 'summary of rights' prepared by the Consumer Financial Protection Bureau." *TransUnion LLC*, 594 U.S. at 418-19 (quoting 15 U.S.C. §§ 1681e(b), g(a)(1), g(c)(2)).

for certain violations. *Id.* at 335 (citing 15 U.S.C. § 1681n(a)). Since its enactment, the FCRA has been amended several times in ways that alter how it preempts state laws.

### 1.   1970

Prior to the FCRA's passage in 1970, "[t]here was little significant state regulation of the credit reporting industry."[9] *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 3 (1st Cir. 2022) (quoting 2 Consumer Law Sales Practices and Credit Regulation § 534 (Sept. 2021)). And "[a]t common law, credit bureau liability as a result of erroneous reporting was quite circumscribed." Charles M. Ullman, *Liability of Credit Bureaus After the Fair Credit Reporting Act: The Need for Further Reform*, 17 Vill. L. Rev. 44, 44 (1971). Consumers were thus "afforded . . . little protection against credit bureaus." *Id.* at 57.

For most American consumers, the FCRA served as the first meaningful attempt to secure "respect for the consumer's right to privacy" and to prevent consumer reporting agencies from using consumer data in an unfair or biased manner. *Houghton v. Ins. Crime Prevention Inst.*, 795 F.2d 322, 323 (3d Cir. 1986) (citation omitted). Despite an absence of state regulation, Congress included in the maiden bill a section titled "Relation to State laws." The section set forth a general rule that the FCRA would preempt state laws related to credit reporting "only to the extent of [a]n inconsistency" between those laws and the federal legislation. In full, the section read:

> This title does not annul, alter, affect, or exempt any person
> subject to the provisions of this title from complying with the laws
> of any state with respect to the collection, distribution, or use of any
> information on consumers, except to the extent that those laws are

---

[9]      "In 1916, Oklahoma was the first state to pass any real legislative controls over reporting agencies, later followed by Massachusetts, New Mexico and New York. Accordingly, at the time FCRA was introduced in Congress—with the exception of these four state statutes—there was little protection for the consumer against the credit bureaus reporting inaccurate credit information." David D. Schein & James D. Phillips, *Holding Credit Reporting Agencies Accountable: How the Financial Crisis May Be Contributing to Improving Accuracy in Credit Reporting*, 24 Loy. Consumer L. Rev. 329, 332 (2012).

inconsistent with any provision of this title, and then only to the extent of the inconsistency.

[Pub. L. No. 91-509, § 622, 84 Stat. 1127, 1136 (1970).]

## 2. *1996 AMENDMENTS*

"In 1996, Congress amended the FCRA to impose new requirements on 'persons,' such as creditors and lenders, who furnish information to credit reporting agencies." *Kirtz v. Trans Union LLC*, 46 F.4th 159, 162 (3d Cir. 2022) (citing Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208, § 2413, 110 Stat. 3009, 3009-447 to -449 (1996)). The 1996 amendments "expanded the FCRA's substantive requirements" and "also expanded [certain] sections to authorize suits against '[a]ny person' who fails to comply with 'any requirement' under the Act." *Id.* (citing 15 U.S.C. §§ 1681n(a), 1681o(a)).

Among the various amendments, the FCRA's section on "Relation to State laws" was modified to extend the preemption of state laws to cover specific "subject matters." Congress inserted language that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to" certain "subject matter[s] regulated under" the Act, namely, those federal provisions that concern "the prescreening of consumer reports," "the time by which a consumer reporting agency must take any action," "the duties of a person who takes any adverse action with respect to a consumer," "the duties of persons who use a consumer report of a consumer in connection with any credit or insurance transaction . . . not initiated by the consumer and that consists of a firm offer of credit or insurance," "information contained in consumer reports," and "the responsibilities of persons who furnish information to consumer reporting agencies."[10] Pub.

---

[10]     The December 14, 1995 Report from the Senate Committee on Banking, Housing, and Urban Affairs explains that Congress amended the preemption section to "provide[] that certain provisions of the FCRA preempt any corresponding provisions of state law." S. Rep. No. 104-185 at 54-55 (1995). The Committee wrote that "[b]y preempting state and local provisions relating to the subject matter regulated by the[] provisions of the FCRA, [it was] establish[ing] the FCRA

L. No. 104-208, § 2419, 110 Stat. 3009, 3009-452 to -453 (1996). Congress added these subject-matter preemption provisions as recognition that "a substantial part of the consumer-reporting process crosses state lines and is national in scope." Schein & Phillips, *Holding Credit Reporting Agencies Accountable*, 24 Loy. Consumer L. Rev. at 336. Indeed, the "1996 Amendments sought to establish uniform standards in key areas . . . to enhance the development of national credit markets." S. Rep. No. 108-166 at 6 (2003).

In light of the "experimental nature" of the subject-matter preemption provisions, "the authors of the 1996 amendments specifically set forth that the preemptions would expire on January 1, 2004." *Id.* The purpose of this sunset "was to prompt Congressional review of the impact of the 1996 amendments after such time that the full range of their effects on credit markets could be comprehensively evaluated."[11] *Id.*

### 3. *2003 AMENDMENTS*

In 2003, Congress again amended the FCRA "[a]s part of an effort to prevent identity theft." *Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 373 (3d Cir. 2012) (citing Fair and Accurate Credit Transaction Act of 2003, Pub. L. No. 108-159, 117 Stat. 1952 (2003)). "Consistent with that purpose," the 2003 amendments "regulate[] the information that can be included on receipts given to customers" and "provide[] for actual damages and attorneys' fees and costs to remedy negligent violations." *Id.* (citation omitted). The amendments also entitle consumers to a free annual file disclosure and require the credit reporting industry to "establish

---

as the national uniform standard in these areas" and "that a single set of Federal rules promotes operational efficiency for industry, and competitive prices for consumers." *Id.*

[11]    The sunset provision stated that the newly added subject-matter preemption provisions would "not apply to any provision of State law" that was "enacted after January 1, 2004." 110 Stat. 3009, 3009-453 (1996).

a centralized source to receive and process such requests."[12] *Middlebrooks v. Experian Info. Sols., Inc.*, Civ. No. 20-2279, 2020 WL 9600586, at *3 (N.D. Ga. Nov. 3, 2020) (citing 15 U.S.C. § 1681j(a)(1)(B)).

Another motivation behind the 2003 amendments was to make permanent the subject-matter preemption provisions added in 1996. *See* S. Rep. No. 108-166 at 6, 25; *see also* Schein & Phillips, *Holding Credit Reporting Agencies Accountable*, 24 Loy. Consumer L. Rev. at 336 ("Preventing these sunset provisions became a key motivation to amend the FCRA again."); Anne P. Fortney, *Uniform National Standards for A Nationwide Industry-FCRA Preemption of State Laws Under the Fact Act*, 58 Consumer Fin. L.Q. Rep. 259, 259 (2004) ("Federal preemption of state laws served as a major impetus for the enactment of the Fair and Accurate Transactions Act . . . at the end of 2003.").

Furthermore, Congress added to the FCRA new "conduct" preemption provisions. These provisions establish that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to the conduct required by the specific provisions of" sections 605(g), 605A, 605B, 609(a)(1)(A), 612(a), 615(e)-(g), 621(f), 623(a)(6), or 628. *See* Pub. L. No. 108-159, § 711, 117 Stat. 2011 (2003). These sections concern the presentation of credit and debit card numbers on receipts, fraud alerts and access to reports when identity theft is suspected, free annual file disclosures to consumers, coordination of consumer complaint investigations, duties when identity theft is alleged, and disposal of records. *See* 15 U.S.C. § 1681t(b)(5).

---

[12]     In 2003, Congress grandfathered in New Jersey's requirement that credit file disclosures be provided free to consumers at least once per year and at a minimal charge if a second request was made in a twelve-month period. Pub. L. No. 108-159, § 212, 117 Stat. 1977-78 (2003) (citing New Jersey Revised Statutes § 56:11-37.10(a)(1) (eff. Dec. 4, 2003)).

### 4. FTC RULEMAKING RELATED TO LANGUAGE REQUIREMENTS

The FCRA's 2003 amendments directed the Federal Trade Commission[13] (FTC) to "prescribe," among other things, regulations to establish "a streamlined process for consumers to request consumer reports."  15 U.S.C. § 1681j(C)(i).  The FTC had to consider "the significant demands that may be placed on consumer reporting agencies in providing such consumer reports." 15 U.S.C. § 1681j(C)(ii)(I).

On March 16, 2004, the FTC proposed a rule intended to implement the 2003 requirements, particularly the requirement that the NCRAs deliver credit file disclosures through a "centralized source."  *Free Annual File Disclosures*, 69 Fed. Reg. 35,468 (June 24, 2004).  The agency then reviewed comments and issued a final rule, which became effective on December 1, 2004.  The FTC explained that it had "strived to strike the balance" that Congress sought "between the availability of free annual file disclosures to consumers and the legitimate concerns of the consumer reporting agencies that are required to provide them."  *Id.* at 35,468.

One of the comments the FTC received from "consumer advocacy groups and a state official" was that information relating to free annual file disclosures should be provided "in languages, other than English, that are spoken by a substantial number of consumers in the United States."  *Id.* at 35,476.  The "commenters point[ed] to the fact that a significant portion of the United States population communicates primarily in languages other than English."  *Id.*

---

[13]     "Until 2011, the FTC was the principal regulatory agency charged with enforcement of the FCRA.  On July 21, 2011, the CFPB was given primary regulatory and enforcement authority."  *McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 95 n.3 (1st Cir. 2022) (citations omitted)); *see also Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.8 (2d Cir. 2019) ("The Consumer Protection Act of 2010 transferred authority from the FTC 'to prescribe rules' or 'issue guidelines' regarding the FCRA to the Consumer Financial Protection Bureau.  Nevertheless, the FTC retains authority to enforce the FCRA."  (citations omitted)).

The FTC ultimately decided not to require information and instructions from the "centralized source" in languages other than English.  It reasoned:

> The Commission believes that requiring multi-language translations of centralized source materials, including the centralized source website itself, would impose significant additional burden on the nationwide consumer reporting agencies at a time when they will already be responding to the multiple and varied new obligations that the FACT Act imposes upon them. Accordingly, the Commission declines, at this time, to require multi-language centralized source information and instructions.  The Commission, however, intends to provide education and outreach to consumers concerning the final rule in Spanish—the language most commonly mentioned by commenters on this issue—and encourages other stakeholders in the centralized source, including the nationwide consumer reporting agencies, to do the same.

[*Id.*]

### 5.  *CFPB Interpretive Rule*

On July 11, 2022, three years after New Jersey amended the NJFCRA to require disclosures in languages other than English, the CFPB issued an interpretive rule to clarify that the "FCRA's express preemption provisions have a narrow and targeted scope" and that "States therefore retain substantial flexibility to pass laws involving consumer reporting to reflect emerging problems affecting their local economies and citizens." *The Fair Credit Reporting Act's Limited Preemption of State Laws*, 87 Fed. Reg. 41,042, 41,042 (July 11, 2022).  The CFPB wrote that "States play an important role in the regulation of consumer reporting" and that "State statutes exist alongside the FCRA," which does not typically preempt "State laws that are more protective of consumers," unless those state laws are either "inconsistent" with the FCRA or run afoul of one of the express preemptions.  *Id.* at 41,042-43.  The CFPB also wrote that 15 U.S.C. § 1681j(a), "which sets forth requirements for nationwide consumer reporting agencies . . . to provide free annual credit reports to consumers . . . [,] provides no requirements regarding the language in which disclosures of information are provided.  Accordingly, if a State law required that a consumer reporting agency

provide information required by the FCRA at the consumer's requests in languages other than English, such a law would generally not be preempted" by the FCRA, which preempts state laws only "with respect to the conduct required by the specific provisions of section 1681j(a)." *Id.* at 41,046 (quoting 15 U.S.C. § 1681t(b)(5)(E)).

### B. NEW JERSEY FAIR CREDIT REPORTING ACT

The New Jersey Legislature enacted the NJFCRA in 1997.  L. 1997, c. 172, eff. Jan. 27, 1998, codified at N.J. Stat. Ann. § 56:11-28, *et seq.*  The NJFCRA was New Jersey's response to the 1996 amendments to the federal Fair Credit Reporting Act.  N.J. Stat. Ann. § 56:11-29(a)-(b).  While the federal amendments "specifically preempt[ed] states from establishing requirements or prohibitions with respect to . . . certain sections of the federal [Act], the provisions of the other sections of the act [we]re left subject to actions by states as long as the provisions enacted in state law are not inconsistent with federal law."  N.J. Stat. Ann. § 56:11-29(d).  The Legislature thus declared that "[t]he purpose of th[e] [NJFCRA] is to provide additional consumer protection with respect to consumer credit reports and credit reporting agencies consistent with the provisions of the" federal FCRA.  N.J. Stat. Ann. § 56:11-29(e).

### 1. 2019 AMENDMENT

On February 7, 2019, New Jersey State Senate Bill 3452 was introduced to require consumer reporting agencies to make credit file disclosures available to New Jersey consumers in Spanish and other languages.[14]  S. 3452 (2019).  The same bill was introduced a week later in the New Jersey General Assembly.  A. 5055 (2019).

---

[14]     The legislative history of S. 3452/A. 5055 (2019) was compiled by the New Jersey State Library and is available on its website.  *See* WEBSITE OF THE NEW JERSEY STATE LIBRARY, *New Jersey Legislative Histories—L. 2019, c. 183*, https://hdl.handle.net/10929.1/27836 (last visited on March 13, 2024).

As initially drafted, the legislation proposed to amend the NJFCRA to require that credit file disclosures be made "available to a consumer upon the consumer's request in Spanish or any other language that the Director of DCA determines is the first language of a significant number of consumers in the State." *Id.*  The determination of which languages the disclosures had to be provided in was left to "the discretion of the director, based on the numerical percentage of all consumers in the State for whom English or Spanish is not a first language or in a manner consistent with any regulations promulgated by the director for this purpose." *Id.*

In March 2019, several changes were recommended by the State Senate's Commerce Committee and the State Senate's Transportation Committee as well as by the General Assembly's Financial Institutions and Insurance Committee.  The recommendations modified the bill to (1) specify that only a reporting agency that compiles and maintains files on consumers on a nationwide basis would be required to make disclosures in languages other than English; (2) define the meaning of a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis; (3) instruct the Director of DCA to require the NCRAs to make the consumer file information available in at least ten languages other than English and Spanish that are the most frequently spoken in New Jersey; and (4) require the NCRAs to post a notice on their websites, in a clear and conspicuous location, of the availability of consumer reporting information in languages other than English.  *Senate Commerce Comm. Statement to S. 3452* (L. 2019, c. 183); *Senate Transportation Comm. Statement to S. 3452* (L. 2019, c. 183*); Assembly Financial Institutions and Insurance Comm. Statement to A. 5055* (L. 2019, c. 183).

The bills were then passed by both the State Senate and General Assembly and signed into law on July 19, 2019.[15]   In relevant part, the NJFCRA now reads as follows:

> A reporting agency that compiles and maintains files on consumers on a nationwide basis shall make the information subject to disclosure pursuant to this section available to a consumer upon the consumer's request in Spanish or any other language that the Director of the Division of Consumer Affairs determines is the first language of a significant number of consumers in the State.  This determination shall be, at the discretion of the director, based on the numerical percentages of all consumers in the State for whom English or Spanish is not a first language or in a manner consistent with any regulations promulgated by the director for this purpose. The director shall require that the information is made available in at least the 10 languages other than English and Spanish that are most frequently spoken as a first language by consumers in this State.
>
> A reporting agency that compiles and maintains files on consumers on a nationwide basis shall provide notice, in any language as determined by the director, on its Internet website in a clear and conspicuous location, of the availability of information subject to disclosure pursuant to this section in languages other than English.
>
> As used in this section, "reporting agency that compiles and maintains files on consumers on a nationwide basis" means a consumer reporting agency that regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide:
>
> (1) Public record information; and
>
> (2) Credit account information from persons who furnish that information regularly and in the ordinary course of business.
>
> [N.J. Stat. Ann. § 56:11-34(e).]

---

[15]     S. 3452 passed the Senate by a vote of 34 to 0, and A. 5055 passed the Assembly 65 to 7. *See* WEBSITE OF THE NEW JERSEY LEGISLATURE, *Bill S3452 Session 2018-2019*, https://www.njleg.state.nj.us/bill-search/2018/S3452 (last visited on March 13, 2024).

The 2019 amendment to the NJFCRA requires the NCRAs (Equifax, Experian, and TransUnion) to provide a New Jersey consumer, "upon the consumer's request," with the consumer's credit file information in either English, Spanish, or one of "at least" ten other languages that the Director determines "are the most frequently spoken as a first language by consumers." N.J. Stat. Ann. § 56:11-34(e). Ultimately, the Director can require the disclosures in "any . . . language . . . determine[d] [to be] the first language of a significant number of consumers in the State." *Id.* The NCRAs are also obligated to post notices on their websites in a conspicuous location informing New Jersey consumers that they can request their credit files in languages other than English. *Id.* To determine the languages, other than English and Spanish, that credit file disclosures are to be provided in, the Director must consider "the numerical percentages of all consumers in the State for whom English or Spanish is not a first language or . . . any regulations promulgated . . . for this purpose." *Id.*

## III.    THE FCRA'S PREEMPTIVE SCOPE

Since the enactment of the FCRA, litigation has periodically arisen as to when the federal statute preempts state and local laws related to credit reporting. The outcome often turns on the specific facts and circumstances of each case, with state and local laws likely to be preempted when they are either an obstacle to the FCRA's purpose or they impinge on a subject or conduct that Congress intended to expressly preempt.

For example, courts have found state and local laws preempted when those laws conflict with "an express Congressional purpose,"[16] intrude on "duties, responsibilities, and liabilities" regulated under the FCRA,[17] or allow for recourse under state law for acts immunized by the

---

[16]     *Retail Credit Co. v. Dade Cnty., Fla.*, 393 F. Supp. 577, 583 (S.D. Fla. 1975).

[17]     *Carney v. Experian Info. Sols., Inc.*, 57 F. Supp. 2d 496, 502-03 (W.D. Tenn. 1999).

federal act.[18]  In contrast, courts have found state and locals laws not preempted when those laws are "consistent with the Congressional intent to protect consumers . . . without upsetting the balance by unduly burdening the credit reporting agencies,"[19] do "not stand as an obstacle to the accomplishment and execution of the . . . objectives of Congress in enacting the Federal Act,"[20] or advance a purpose of the federal act while constituting only "an incidental divergence of regulation."[21]

Notably, in 2004, an insurance group asked the Eighth Circuit Court of Appeals to rule that a Minnesota statute was preempted by the FCRA.  *Davenport v. Farmers Ins. Grp.*, 378 F.3d 839 (8th Cir. 2004).  The statute required insurance companies to notify applicants and policyholders if a company intended to obtain their personal information.  The insurance group argued that the Minnesota law was "inconsistent with the FCRA simply because [Minnesota] regulated a matter not addressed by the FCRA."  *Id.* at 842.  The Eighth Circuit disagreed, and it "decline[d] to interpret Congress's silence with regard to any notice requirement to signify its intent to prohibit states from enacting their own regulations on the issue."  *Id.*

The Court wrote that the FCRA "is not intended to occupy the entire regulatory field with regard to consumer reports" and that, "[o]n the contrary, the statute plainly limits its preemption of state regulations 'only to the extent of the inconsistency' with those regulations."  *Id.* at 842-43 (quoting 15 U.S.C. § 1681t(a)).  The Eighth Circuit approvingly cited commentary from the FTC,

---

[18]     *Anderson v. Trans Union, LLC*, 345 F. Supp. 2d 963, 973-74 (W.D. Wis. 2004).

[19]     *Retail Credit Co.*, 393 F. Supp. at 584-85.

[20]     *Credit Data of Ariz., Inc. v. State of Ariz.*, 602 F.2d 195, 198 (9th Cir. 1979); *see also State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 633 (Alaska 2007).

[21]     *Equifax Servs., Inc. v. Cohen*, 420 A.2d 189, 212 (Me. 1980).

which "reiterate[d] that the FCRA was not intended to usurp the entire field of consumer report law." *Id.* at 843 (citing 16 C.F.R. § 600.1(b)).

More recently, in *Galper v. JP Morgan Chase Bank*, the Second Circuit Court of Appeals considered whether a New York law that created a private cause of action for victims of identity theft was preempted by the FCRA.  802 F.3d 437, 441 (2d Cir. 2015).  Specifically, the Court considered whether the New York law was preempted because it was "with respect to" subject matter regulated by 15 U.S.C. § 1681s-2, which "relat[es] to the responsibilities of persons who furnish information to consumer reporting agencies."  *Id.* (quoting 15 U.S.C. § 1681t(b)(1)(F)). "As with any preemption provision," the Second Circuit wrote, the FCRA's should be construed "fairly but narrowly, mindful in the appropriate case that 'each phrase within [the provision] limits the universe of [state action] pre-empted by the statute.'"  *Id.* at 445 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 551 (2001)).

Applying section 1681t(b)(1)(F), the Second Circuit held that the FCRA does not generally "preempt state law claims against a defendant who happens to be a furnisher of information to a consumer reporting agency within the meaning of the FCRA if the claims against the defendant do not also concern that defendant's legal responsibilities as a furnisher of information under the FCRA."  *Id.* at 446.   The Court was unpersuaded by the defendant's "argument that § 1681t(b)(1)(F) preempts all claims 'relating to the responsibilities' of furnishers in any way, and regardless of the capacity in which the furnisher is acting."  *Id.* at 447.  "This broad argument," underscored the Court, "overlooks the language of the statute."  *Id.*  It explained:

> In this statutory context, the phrase "relating to" is not used to describe the scope of preemption.  Instead, the phrase exists as a shorthand reference to describe the subject matter governed by § 1681s-2. If Congress had intended to preempt claims that relate in any way to someone furnishing information to a consumer reporting agency, it could easily have drafted the statute to say that state laws

"relating to the furnishing of information to consumer reporting agencies are preempted."

But this it did not do.  Congress opted instead to use language that focuses more narrowly on the preemption of laws that regulate the *responsibilities* of persons who furnish information to consumer reporting agencies.

[*Id.* (emphasis in original).]

And most recently, the First Circuit Court of Appeals considered a facial challenge to two Maine laws that were designed to regulate the reporting of overdue medical debt and debt resulting from economic abuse.  *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 3 (1st Cir. 2022).  The Maine laws limited when and how consumer reporting agencies could report debt from medical expenses and required the reinvestigation of a debt if the consumer provided documentation that the debt was the result of economic abuse.  *Id.* at 4.  The impetus behind the laws was the belief that, "unlike in the case of the purchase of a house or a car, medical debt is usually unplanned and involuntarily incurred" as well as that "many domestic violence cases involve economic abuse and so survivors of such abuse need help to regain control of their finances so they can . . . retake control of their lives."  *Id.* at 4-5.

Analyzing whether the two Maine laws were "swept into the maw of FCRA preemption," the First Circuit noted that the FCRA has a "general rule" that inconsistent state laws are preempted "only to the extent of the inconsistency" as well as a series of express subject-matter and conduct preemptions.  *Id.* at 6 (quoting 15 U.S.C. § 1681t(a)).  One of these express preemptions, observed the Court, is located at 15 U.S.C. § 1681t(b)(1)(E), and it states that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681c . . . , relating to information contained in consumer reports."  *Id.* (quoting 15 U.S.C. § 1681t(b)(1)(E)).  In seeking to invalidate the Maine laws, CDIA advocated for an encompassing view of this provision to foreclose state regulation "relate[d] to information

contained in consumer reports, . . . regardless of whether they regulate subject matter regulated by Section 1681c" of the FCRA.  *Id.*  The Court was "not persuaded."  *Id.*

Interpreting the FCRA to preempt "all state laws 'relating to information contained in consumer reports,'" wrote the First Circuit, was "not the most natural reading of the statute's syntax and structure."  *Id.*  The Court cited United States Supreme Court precedent for the proposition that Congress's use of "the phrase 'with respect to' narrows the scope of preempted subject matter to its referent or referents" and, thus, "Section 1681t(b)(1)(E)'s mandate expresses Congress' intent only to preempt those claims that concern subject matter regulated under Section 1681c."  *Id.* at 7 (citing *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 252 (2013)).

In addition, the First Circuit's view was that if Congress "intended to preempt all state laws relating to information contained in consumer reports, it could have easily so stated," but it did not.  *Id.* at 8.  And the Court saw "no reason to presume that Congress intended, in providing some federal protection to consumers regarding the information contained in credit reports, to oust all opportunity for states to provide more protections, even if those protections would not otherwise be preempted as 'inconsistent' with the FCRA as under 15 U.S.C. § 1681t(a)."  *Id.* at 9.

Ultimately, the First Circuit held that Maine's law regulating medical debt was not preempted by the FCRA's provisions regulating the reporting of veterans' debt.  The Court reasoned that "[i]f Congress had intended to regulate the reporting of all those instances of medical debt it could simply have said so, without textually limiting the field of regulation to veterans' medical debt.  And that is not what it did."  *Id.* at 12.  Nevertheless, the First Circuit remanded for the district court to consider to what extent the Maine law was partially preempted by the FCRA's regulation of veterans' medical debt.  *Id.* at 12-13.  Likewise, the First Circuit held that even though Maine's law regulating economic abuse was not generally preempted by the FCRA, the district

court should consider to what extent it was preempted by the FCRA's protections against identity theft.  *Id.* at 13-14.

## IV.   <u>LEGAL STANDARD</u>

"Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure."  *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law."  *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*

The standard is the same in the context of dueling motions for summary judgment.  *Auto-Owners Ins. Co.*, 835 F.3d at 402.  "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'"  *Id.* (quoting 10A Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

## V.   <u>PARTIES' ARGUMENTS</u>

### A.  Plaintiff—CDIA

CDIA submits that the 2019 amendment to the NJFCRA is "inconsistent with federal law and impermissibly seeks to regulate conduct that is reserved to federal law."  (ECF No. 59-4 at 12.)  As to the alleged inconsistency, CDIA maintains that "[i]t is impossible for any NCRA to comply with both the [federal] requirement" to disclose "all information in the consumer's file at

the time of the request" as well as New Jersey's "requirement to provide disclosures in real time in at least eleven additional languages when [NCRAs] exclusively collect, maintain, and report such information in English." (*Id.* at 22-23 (emphasis removed) (quoting 15 U.S.C. § 1681g(a)).) If New Jersey's requirements are enforced, warns CDIA, this "necessarily means that an NCRA will no longer be providing the consumer with a disclosure of the information 'in the consumer's file' under the FCRA, but a *translation* or other *interpretation* of its file information." (*Id.* at 24 (emphases in original).) For support, CDIA points to the FTC's 2004 rulemaking wherein the agency declined "to require multi-language centralized source information and instructions." (*Id.* at 25-26 (emphasis removed) (citing *Free Annual File Disclosures*, 69 Fed. Reg. 35,468 (June 24, 2004)).) CDIA claims that this is evidence that "the very question as to whether the NCRAs should provide disclosures in languages other than English has already been considered and decided by the federal agency delegated with the responsibility of establishing the rules governing the NCRAs' conduct." (*Id.* at 25.)

As to the contention that the NJFCRA is expressly preempted because it regulates conduct specifically reserved to federal law, CDIA argues that the "FCRA expressly governs *what* must be included in a file disclosure, *how* the NCRAs must permit requests of those free annual file disclosures, and *when* the free annual file disclosures must be provided." (*Id.* at 32 (emphases in original) (citing 15 U.S.C. §§ 1681j(a)(1)(B) & (a)(2)).) CDIA insists that, "[b]y requiring NCRAs to translate the information in their files," New Jersey "necessarily imposes new conduct requirements regarding 'what' and 'how,'" which violates the preemption provisions that bar further regulation of conduct already addressed by the FCRA. (*Id.* at 32-33.) CDIA writes that the FCRA's use of "with respect to" in its preemption provisions should mean "concerning" or "relating to," ensuring that the federal statute has "a broad preemptive effect." (*Id.* at 27-31.)

CDIA also asks the Court to disregard the interpretive rule issued by the CFPB in 2022. (ECF No. 75 (citing *The Fair Credit Reporting Act's Limited Preemption of State Laws*, 87 Fed. Reg. 41,042 (July 11, 2022)).)  Because the interpretive rule was not done by formal rulemaking, CDIA posits that it "carries no force of law, and is not entitled to *Chevron* deference," particularly on a "major question."  (*Id.* at 1-3.)  CDIA believes the rule holds no persuasive force "because the plain text of the FCRA clearly and unambiguously addresses its preemptive scope."  (*Id.* at 2.)

Finally, CDIA argues that even if the 2019 amendment to the NJFCRA is not preempted by federal law, the New Jersey law violates the NCRAs' commercial speech rights under the First Amendment by "essentially compelling the NCRAs to speak in multiple languages on demand . . . without meaningfully advancing any relevant stated government interests."  (ECF No. 59-4 at 34.) CDIA contends that the law "fails under either a heightened judicial scrutiny or intermediate scrutiny standard" because "New Jersey arbitrarily decided to require federally required disclosures to be made available in eleven or more languages, in addition to English, without stating any legal or factual basis for imposing the requirement."  (*Id.* at 35-37.)  Even if the New Jersey law is evaluated under a rational basis review, CDIA maintains that the law still fails because New Jersey "has offered no evidence" that the statute's broad requirements are "*reasonably* related to a legitimate governmental purpose," when balanced against the heavy burden imposed on the NCRAs.  (ECF No. 82 at 15-16 (emphasis in original).)

**B. DEFENDANT—NEW JERSEY**

New Jersey argues that the 2019 amendment to the NJFCRA "is neither expressly nor impliedly preempted by the FCRA.  Rather, the NJFCRA seeks to protect New Jersey residents with *additional* layers of consumer protection by requiring [NCRAs] to issue the mandated file disclosures to consumers in Spanish and no fewer than ten other languages . . . upon request."  (ECF No. 43-1 at 10 (emphasis in original).)  New Jersey contends that "[n]othing in the FCRA

says that New Jersey cannot exercise its . . . authority in the area of consumer protection in this manner, and there is no doubt that the [NCRAs] can simultaneously comply with both state and federal law." (*Id.*)

As to express preemption, New Jersey argues that CDIA's reading of 15 U.S.C. § 1681t(b)(5) would prohibit states from "enacting any laws that impose additional consumer protections that relate in any manner whatsoever to . . . file disclosure obligations under federal law, even if that state's rule is completely consistent with the FCRA." (*Id.* at 21.) This outcome, writes New Jersey, "is inconsistent not only with the preemption provisions in the FCRA" but "flies in the face of the plain language of the law and well-established principles of statutory interpretation." (*Id.* at 22-26.)

As to implied preemption, New Jersey argues that requiring credit disclosures to be provided in different languages "does not change the underlying information contained in the file," so the NCRAs "can comply with the requirements of both" federal and state law without offending either. (*Id.* at 27-28.) New Jersey underscores that the FCRA already requires file disclosures to be made "in a manner that is digestible for consumers, which inevitably requires some degree of alteration in style rather than substance," such as converting it from hard copy to digital and synthesizing it, and this process is not meaningfully different than "translating that information into a different language." (*Id.* at 29.)

As to the CFPB's 2022 interpretive rule, New Jersey believes it "resoundingly supports the State's position" and "is entitled to deference under *Skidmore*." (ECF No. 76 at 1-3.) The rule, according to New Jersey, "is reasonable given [the] FCRA's purposes, as [the statute's] guarantee of a free annual credit report aims to help consumers better understand their credit history—a purpose *advanced* by allowing States to ensure this report is disclosed in a language the consumer can understand." (*Id.* at 3 (emphasis in original).)

Finally, as to the First Amendment challenge, New Jersey writes that "the NJFCRA directly advances a substantial government interest—to ensure that the benefits of consumer protection reach all New Jerseyans, regardless of their native language—and because the requirements . . . are narrowly tailored to advance that vital interest, the NJFCRA legally regulates commercial speech." (ECF No. 43-1 at 10.)  In its post-argument briefing, New Jersey further contends that the law passes scrutiny under either the four-part test laid out in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980), or the rational-basis test for disclosure requirements and compelled speech set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  (ECF No. 83 at 10-12.)

### C.  *AMICUS*—NATIONAL CONSUMER LAW CENTER

The National Consumer Law Center, a non-profit that advocates for the interests of low-income consumers and others who are disadvantaged, filed an *amicus* brief "to offer its perspective of the importance [of] language translation of credit reports for residents of New Jersey."  (ECF No. 55 at 6.)  NCLC argues that translations offer "enormous benefits" to persons for whom English is not a first language and who are considered "limited English proficient" or "LEP."  (*Id.* at 7.)  It points out that "[c]redit reports . . . can determine whether a consumer can obtain a loan to purchase a home or an automobile, obtain insurance for both, open a new business, or finance their college education. . . .  Credit reports are also used by employers and landlords."  (*Id.* at 8.) It submits that providing such reports "solely in English leaves millions of LEP residents . . . without access to a tool that is critical to effectively managing their economic lives."  (*Id.*)  NCLC emphasizes that translations are needed in New Jersey, which has the fifth highest share of LEP residents in the United States.  (*Id.* at 9-10.)  Finally, NCLC notes that one of the NCRAs (Equifax) has started voluntarily providing credit file disclosures to consumers in Spanish.  (*Id.* at 15-18.)

## VI.   <u>DISCUSSION</u>

The Court begins its analysis by confirming that there is standing to hear this pre-enforcement challenge, and it proceeds to examine federal preemption followed by the First Amendment issues.[22]

### A.   STANDING

Article III of the United States Constitution limits the jurisdiction of the federal courts to actual cases or controversies.   U.S. Const., art. III, § 2, cl. 1.   "This case-or-controversy limitation . . . is crucial in 'ensuring that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society.'"   *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).   The existence of a case or controversy is therefore "a prerequisite to all federal actions, including those for declaratory or injunctive relief."   *Philadelphia Fed'n of Tchrs., Am. Fed'n of Tchrs., Loc. 3, AFL-CIO v. Ridge*, 150 F.3d 319, 322 (3d Cir. 1998) (quoting *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994)).

"One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue."   *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).   Standing is established by "show[ing] an injury in fact fairly traceable to the challenged action that a favorable ruling may redress."   *Id.*   "The injury-in-fact requirement ensures the plaintiff has a 'personal stake in the outcome of the controversy.'"   *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).   A case must also be ripe.

---

[22]   The Court examines preemption before the First Amendment issues because, even though federal preemption arises under the Supremacy Clause, the Third Circuit treats preemption as "'statutory' for purposes of [the] practice of deciding statutory claims first to avoid unnecessary constitutional adjudications."   *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 272 n.13 (3d Cir. 2004) (quoting *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 299 F.3d 235, 239 n.2 (3d Cir. 2002)).

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 219 (3d Cir. 2023).  It must not depend "on contingent future events that may not occur as anticipated, or . . . may not occur at all."  *Id.* (citation omitted).

In the context of pre-enforcement challenges, it is well established that a "plaintiff may challenge the constitutionality of a [law or] regulation before suffering an 'actual' injury arising from enforcement so long as the threatened injury is 'imminent.'"  *Greenberg*, 81 F.4th at 384 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).[23]  Nevertheless, the federal courts have "never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court."  *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021).  Those seeking "to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments."  *Id.*

A plaintiff pursuing a pre-enforcement challenge "satisfies the injury-in-fact requirement where he [or she] alleges he [or she] intends to do something arguably protected by the Constitution, but arguably barred by the [law or] regulation, and that he [or she] faces a credible threat of [enforcement] under the [law or] regulation."  *Greenberg*, 81 F.4th at 384-85 (citing *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 124-25 (3d Cir. 2023)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." (quoting *Clapper*, 568 U.S. at 414)).  To be credible, the threat of enforcement "may not

---

[23]     *See also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." (emphasis in original)); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough." (quoting *Commonwealth of Pennsylvania v. State of W. Virginia*, 262 U.S. 553, 593 (1923))).

be merely 'imaginary or wholly speculative.'" *New Jersey Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849, 855 (3d Cir. 2022) (quoting *Susan B. Anthony List*, 573 U.S. at 160).

Both parties argue that there is standing in this case. CDIA submits that New Jersey's law targets its members and that the NCRAs will have to "make material changes to their operations" to comply "or face real and substantial enforcement risk." (ECF No. 82 at 6.) The State emphasizes that even absent regulation delineating the ten or more languages in which to mandate disclosures, the law's express terms require translation of file disclosures into Spanish, and some of the NCRAs have indicated that they "intend to [continue to] provide free annual credit reports in English only." (ECF No. 83 at 7-8.) This constitutes a violation, posits the State, that creates a credible threat of enforcement. (*Id.* at 8.)

The Court finds that Plaintiff satisfies the elements for standing and that this pre-enforcement challenge is ripe.[24] The record establishes that some of CDIA's members intend to continue to provide file disclosures in English only, which is forbidden by the challenged law and implicates the NCRAs' commercial speech rights under the First Amendment.

Further, New Jersey's law directly targets the NCRAs by proscribing them from continuing to provide credit file disclosures to New Jersey consumers only in English—and requiring the disclosures to be in Spanish plus ten or more other languages to be specified by the Director of DCA. This constitutes a requirement that may be preempted by the FCRA under the Supremacy Clause or may violate the NCRAs' commercial speech rights under the First Amendment. Indeed, it is undisputed that consumer credit information is recorded by the NCRAs in English only. And

---

[24] Where, as here, a plaintiff is an association, it may "bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).

while one NCRA (Equifax) appears to have started voluntarily providing, after this case was initiated, credit file disclosures to consumers in Spanish, nothing in the record before the Court suggests that the other two NCRAs are willing to voluntarily comply with the law.[25]  (ECF No. 83 at 7 ("[T]he conduct is clear: CDIA's members intend to provide free annual credit reports in English only.").)  There is certainly no suggestion that the NCRAs have been or are willing to provide credit file disclosures in any language other than English and Spanish.[26]

There is also a credible threat of enforcement.  At minimum, the statute currently requires disclosures to New Jersey consumers in Spanish, which could be enforced by either New Jersey's Attorney General or Division of Consumer Affairs,[27] and consumers themselves have private remedies under New Jersey law.[28]  In addition, once the Director of DCA promulgates the anticipated regulations, the NCRAs will be exposed to the expanded threat of substantial liability if they do not make file disclosures available in the ten or more languages that are selected by the Director of DCA.  CDIA underlines that if its members fail to comply, New Jersey's regulations

---

[25]    Even if circumstances have changed since the case was initiated, "standing is to be determined as of the commencement of suit."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.5 (1992).  And the Supreme Court has noted that when a mootness issue arises after a case with standing "has been brought and litigated," it may "prove more wasteful than frugal" to abandon it "at an advanced stage," particularly when the case involves issues that are "capable of repetition, yet evading review."  *Friends of the Earth, Inc.*, 528 U.S. at 191-92.

[26]    Granted, New Jersey's Director of the Division of Consumers Affairs has yet to issue regulations identifying what those ten or more other languages will be, but counsel for New Jersey represented at oral argument that the State is in the process of finalizing the regulations and that they will be promulgated soon.  CDIA represents that to comply with these anticipated regulations, their members will be forced to "make material changes to their operations."  (ECF No. 82 at 6.)

[27]    (ECF No. 83 at 8 n.1 ("The Attorney General and Division of Consumer Affairs have authority to enforce . . . § 56:11-34 under, *inter alia*, N.J. Stat. Ann. § 56:8-4(b) . . . .").)

[28]    (ECF No. 82 at 6 n.3 ("Additionally, consumers have private rights of action under state law."  (citing N.J. Stat. Ann. §§ 56:11-38 to -39))); *see also Boone v. T-Mobile USA Inc.*, Civ. No. 17-378, 2018 WL 588927, at *16 (D.N.J. Jan. 29, 2018) ("[A] private right of action exists against corporate entities under the NJ FCRA.").

permit the recovery of civil penalties up to $10,000.00 for an initial violation and up to $20,000.00 for each subsequent violation.  (ECF No. 82 at 6 n.3 (citing N.J.A.C. § 13:45-5.2).)

And though New Jersey has yet to enforce the statute against the NCRAs, the State has not disavowed its intent to do so.  To the contrary, it has vigorously defended this suit and indicated that it will ensure the statute's full implementation.  The State has also taken the position in this litigation that the NCRAs are subject to New Jersey's mandates.  The threat of enforcement is thus live and the potential injury to the NCRAs from future enforcement is "concrete" and "imminent." *See Greenberg*, 81 F.4th at 386 ("Courts often determine there is a credible threat of prosecution where the government refuses to [disavow enforcement]."  (collecting cases)); *see also New Jersey Bankers Ass'n*, 49 F.4th at 856 ("The Attorney General—the person charged with enforcing the statute—has already articulated that NJBA is subject to the prohibitions in the statute.  Based on his interpretation, we have no reason to believe that the Attorney General would decline to enforce § 19:34-45 . . . .").

In a similarly postured case, the Fifth Circuit Court of Appeals recently found that CDIA had associational standing to pursue a pre-enforcement challenge to a Texas law that prohibited the NCRAs "from including information regarding certain medical debt collection accounts in consumer credit reports . . . furnished to third-parties."  *Consumer Data Indus. Ass'n v. Texas through Paxton*, 2023 WL 4744918, at *2 (5th Cir. July 25, 2023).  At the time of the challenge, no formal enforcement proceedings had been undertaken or threatened by the Texas Attorney General and the law had been on the books for fewer than five years.  *Id.* at *4-5.  Even so, the Fifth Circuit found that several factors supported the conclusion that there was an injury-in-fact sufficient for purposes of standing: the Texas Attorney General had never "suggested that the statute would *not* be enforced in the future"; the statute was relatively recent and not "moribund"; and CDIA had "sufficiently alleged that certain members must either make material operational

30

changes to comply . . . or expose themselves to a substantial threat of enforcement." *Id.* at *4-6 (emphasis in original). The same factors support finding an injury-in-fact and associational standing here: New Jersey's Attorney General has not disavowed enforcing the statute against the NCRAs; the statute is relatively recent and not moribund; and CDIA has sufficiently alleged that the NCRAs will need to make material operational changes to comply with the law's requirements or face substantial penalties when enforcement occurs.

The Court therefore concludes that Plaintiff has Article III standing for this suit and that the pre-enforcement challenge is ripe.

### B. FEDERAL PREEMPTION

The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, displaces state law that "interferes with or is contrary to federal law." *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 287 (3d Cir. 2020) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). There are three ways that "[f]ederal law can preempt state law . . . : (1) express preemption; (2) field preemption; or (3) conflict preemption."[29] *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021) (citing *Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010)). These categories "'are not rigidly distinct' . . . [a]nd at least one feature unites them: Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (first quoting *Crosby v. National Foreign Trade Council*,

---

[29]     Field and conflict preemption are sometimes referred to as implied preemption. *See Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701, 709 (3d Cir. 2018) ("There are several types of preemption: express and implied, and within implied, field and conflict.").

530 U.S. 363, 373 n.6 (2000); and then quoting *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

When federal preemption is invoked, the "inquiry is guided by two principles." *Navient Corp.*, 967 F.3d at 288 (citing *Farina*, 625 F.3d at 116). The first is that "the intent of Congress is the 'ultimate touchstone' of preemption analysis." *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). In discerning Congressional intent, courts "look to the language, structure, and purpose of the relevant statutory and regulatory scheme to develop a reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 (3d Cir. 2018) (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016)).

The second principle is "the basic assumption that Congress did not intend to displace state law." *Navient Corp.*, 967 F.3d at 288 (quoting *Farina*, 625 F.3d at 116). "[B]ecause the States are independent sovereigns in [the] federal system, [courts] have long presumed that Congress does not cavalierly preempt state-law causes of action," especially when a "state is exercising its police power." *Id.* (quoting *Lohr*, 518 U.S. at 485). However, when a federal statute contains an express preemption clause or when a case arises in an area that has historically been heavily regulated by the federal government, courts "do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the [the statute], which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)).

### 1. EXPRESS PREEMPTION

Express preemption "applies where Congress explicitly preempts state law in the statutory language." *Navient Corp.*, 967 F.3d at 287 (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). "[T]he presence of an express preemption provision does not end the inquiry. While

it means [that courts] need not inquire whether Congress intended to preempt some state law, [courts] still must examine congressional intent as to the scope of the preemption provision." *Id.* at 288 (quoting *Farina*, 625 F.3d at 118). "To identify the domain expressly preempted by Congress, [courts] read 'the words of a statute . . . in their context and with a view to their place in the overall statutory scheme.'" *Id.* (quoting *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019)).

CDIA argues that the 2019 amendment to the NJFCRA is expressly preempted by sections 1681t(b)(5)(B) and (E) of the FCRA. These conduct preemption sections state in relevant part:

> No requirement or prohibition may be imposed under the laws of any State—
>
> . . . .
>
> > **(5)** with respect to the conduct required by the specific provisions of—
> >
> > . . . .
> >
> > > **(B)** section 1681c-1 of this title; [and]
> > >
> > > . . . .
> > >
> > > **(E)** section 1681j(a) of this title[.]
>
> [15 U.S.C. § 1681t(b)(5)(B) & (E).]

Section 1681c-1 concerns "identity theft prevention." It requires, among other things, that when "a consumer reporting agency includes a fraud alert in the file of a consumer . . . , the consumer reporting agency . . . disclose to the consumer that the consumer may request a free copy of the file of the consumer . . . [and] provide to the consumer all disclosures required to be made . . . without charge to the consumer." 15 U.S.C. § 1681c-1(a)(2).

Section 1681j(a) concerns the "free annual disclosure" that consumers are entitled to under the FCRA. It specifies that consumer reporting agencies must produce consumers' files, free of

charge, at least once annually, and must operate from a "centralized source." 15 U.S.C. § 1681j(a). It also details other aspects, including timing, reinvestigations, and charges. *Id.*

Although neither section 1681c-1 nor section 1681j(a) speak to what language file disclosures must be provided in, CDIA argues that because (1) these provisions regulate what must be in a file disclosure, how the disclosure should be made, and when it should be made, and (2) section 1681t(b)(5) preempts states from imposing laws "with respect to [such] conduct," this necessarily means that New Jersey exceeded its authority when it required the NCRAs to provide file disclosures in languages other than English. (ECF No. 59-4 at 31-33.) In other words, CDIA's position is that because sections 1681c-1 and 1681j(a) of the FCRA contain Congressional direction as to what should be in file disclosures and when those disclosures should be made, any further regulation of file disclosures is forbidden, even if the regulation relates to conduct not specifically addressed by Congress.

Based on a close review of the statutory provisions at issue, the Court disagrees with CDIA and finds that the FCRA's conduct preemption sections do not expressly preempt the 2019 amendment to the NJFCRA. CDIA's proposed interpretation of the FCRA is not a natural one and is not supported by the context of the statute as a whole. *See Contreras Aybar v. Sec'y United States Dep't of Homeland Sec.*, 916 F.3d 270, 273 (3d Cir. 2019) ("To determine whether a statutory provision is 'unambiguous,' [courts] consider the text of the provision and the broader context of the statute as a whole," keeping in mind "that courts 'are obligated to construe statutes sensibly and avoid constructions which yield absurd or unjust results." (quoting *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012))). New Jersey's law does not change what must be in a file disclosure, how the disclosure should be made, or when it should be made. The law essentially requires that the disclosure or information already provided to consumers in English also be made available in Spanish or one of ten or more other languages.

If either section 1681c-1 or section 1681j(a) addressed the language file disclosures should be made in, that would largely end the analysis.  Under that circumstance, the 2019 amendment to the NJFCRA would be expressly preempted because section 1681t(b)(5) of the FCRA prohibits a state from passing a law "with respect to" conduct regulated "by the specific provisions" of sections 1681c-1 and 1681j(a).  That is not the case here, however.  Neither section contains "specific provisions" related to the language(s) of consumer file disclosures.  There is also nothing that suggests that Congress contemplated this issue when it first enacted and later amended the federal statute.  There is thus no basis to read the FCRA to preempt state law "with respect to" the language of file disclosures.  *See Dan's City Used Cars, Inc.*, 569 U.S. at 261 ("That phrase ['with respect to'] 'massively limits the scope of preemption.'"  (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting))).

To overcome this Congressional silence, CDIA advocates for a broad reading of the FCRA's conduct preemption provisions to preempt any state laws that *relate, generally, to the subjects addressed* in sections 1681c-1 and 1681j(a).  CDIA's suggested interpretation of section 1681t(b)(5) is too broad.  Section 1681t(b)(5) preempts state laws only "*with respect to* the conduct required by the *specific* provision*s of*" sections 1681c-1 and 1681j(a).  15 U.S.C. § 1681t(b)(5)(B) and (E) (emphases added).  It plainly does not say, as CDIA would have it, that the FCRA preempts any and all state laws related to file disclosures.  Indeed, as the First Circuit Court of Appeals recently recognized, Congress's use of "the phrase 'with respect to' narrows the scope of preempted subject matter," as opposed to expanding it.  *Frey*, 26 F.4th at 7 (citing *Dan's City Used Cars, Inc.*, 569 U.S. at 261).  And "[s]o construed, the preemption clause necessarily reaches a subset of laws narrower than those that merely relate[] to information contained in consumer reports" or those that govern issues attendant to how file disclosures are made.  *Id.* at 7-8; *see also Galper*, 802 F.3d at 447 ("This broad argument overlooks the language of the statute.  In this

statutory context, the phrase 'relating to' is not used to describe the scope of preemption.  Instead, the phrase exists as a shorthand reference to describe the subject matter governed by" the FCRA's specific exceptions.).

CDIA's interpretation also falls short because if, as asserted, Congress sought to leave no room for the State of New Jersey—or any other state—to enact any laws related in any way to file disclosures, it could have easily done so.  *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992) ("To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier."  (citation omitted)); *Galper*, 802 F.3d at 447 ("If Congress had intended to preempt claims that relate in any way to someone furnishing information to a consumer reporting agency, it could easily have drafted the statute to say that . . . .").  Congress did not do so.  Instead, it chose to preempt state laws "with respect to" the "*specific* provisions of" the FCRA.  15 U.S.C. § 1681t(b)(5) (emphasis added).  CDIA offers no cogent reason why this circumscribed language should be read expansively to encompass all state laws that may relate to file disclosures, including state laws that mandate credit file disclosures be made available to consumers in languages other than English.

Finally, the CFPB's 2022 interpretive rule supports the Court's reading of the FCRA's conduct preemption provisions.  Although the Court does not defer to the rule, the CFPB has a similar view that "the plain text of section[] . . . 1681t(b)(5) . . . ha[s] a narrow and targeted scope" and that, "if a State law does not concern 'the conduct required by' the enumerated section . . . , then it is not preempted."  *The Fair Credit Reporting Act's Limited Preemption of State Laws*, 87 Fed. Reg. 41,043, 41,046 (July 11, 2022).  Notably, the CFPB confirms that the FCRA has "no requirements regarding the language in which disclosures of information are provided."  *Id.*  There is thus no ground to find that a state law requiring "a consumer reporting agency [to] provide

information required by the FCRA at the consumer's request in languages other than English" is preempted as conduct already regulated under federal law. *Id.* Any other conclusion would be out of sync with the view that federal preemption provisions should be construed "fairly but narrowly." *Galper*, 802 F.3d at 445 (quoting *Lorillard Tobacco Co.*, 533 U.S. at 551).

Accordingly, this Court finds that the 2019 amendment to the NJFCRA is not expressly preempted by the FCRA.

### 2. FIELD PREEMPTION

Field preemption "focuses on when Congress does not expressly preempt state law but where 'federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law in that field.'" *Navient Corp.*, 967 F.3d at 287 (quoting *Sikkelee*, 822 F.3d at 688). In such cases, "[w]here Congress expresses an intent to occupy an entire field, States are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards." *Id.*

Neither CDIA nor New Jersey contends that field preemption applies or is at issue in this case; thus, the Court finds it undisputed that field preemption does not provide a basis to preempt the 2019 amendment to the NJFCRA. In any event, courts have declared that the FCRA was never intended to occupy the entire field of consumer reports. *See, e.g.*, *Frey*, 26 F.4th at 9 ("This is not a case in which the federal government ousted states from regulating the field of consumer credit reports . . . ."); *Davenport*, 378 F.3d at 842 ("The FCRA makes clear that it is not intended to occupy the entire regulatory field with regard to consumer reports."); *see also Aghaeepour v. N. Leasing Sys., Inc.*, 378 F. Supp. 3d 254, 263 n.2 (S.D.N.Y. 2019) ("[T]he Federal Trade Commission's commentary on the statute . . . provides that the FCRA was not intended to usurp the entire field of consumer report law." (citations omitted)).

### 3. CONFLICT

Conflict preemption "exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Klotz*, 991 F.3d at 463 (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)). "The question for 'impossibility' [preemption] is whether the private party could independently do under federal law what state law requires of it." *Sikkelee*, 907 F.3d at 709 (quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011)).

CDIA maintains that New Jersey's translation requirement "means that an NCRA will no longer be providing the consumer with a disclosure of the information 'in the consumer's file' under the FCRA, but a *translation* or other *interpretation* of its file information." (ECF No. 59-4 at 24 (emphases in original).) In other words, because a consumer's file is maintained by NCRAs in English, CDIA asserts that requiring translation prior to production would conflict with the FCRA, as a matter of law, because translation means that NCRAs are not providing to consumers the information that is actually in their file. The Court disagrees.

Nowhere in the FCRA has Congress required the NCRAs to provide credit file information to consumers in English. Nor has Congress required the NCRAs to maintain a consumer's file information in English or in any other language. To the contrary, the FCRA defines the term "file" as encompassing "all of the information on that consumer recorded and retained by a consumer reporting agency *regardless of how the information is stored*." 15 U.S.C. § 1681a(g) (emphasis added). This weighs against the claim that translation of file information prior to production conflicts with the federal requirement that the information in a consumer's credit file be produced to that consumer at his or her request. And CDIA's argument that the translation of file information somehow alters the nature of the information stored in a consumer's file is unconvincing. As multiple federal Courts of Appeals have recognized in other contexts, a neutral translation is

ordinarily "no more than a 'language conduit.'"  *United States v. Vidacak*, 553 F.3d 344, 352 (4th Cir. 2009).

Moreover, as both the State and NCLC emphasize, the NCRAs do not produce to consumers their file information in raw form; instead, "the contents of a consumer's file consist of 'segments and bits and bytes,' which must be translated into plain English for a file disclosure . . . . [Thus,] [t]here already is a process of translation which occurs."  (ECF No. 55 at 18-19 (citing *Shaw v. Experian Info. Sols., Inc.*, 2016 WL 5464543, at *3 (S.D. Cal. Sept. 28, 2016), *aff'd*, 891 F.3d 749 (9th Cir. 2018) ("Unlike a credit report, which contains industry codes and fields which are designed to be read by computers and which would be unfamiliar and meaningless to a lay consumer, the consumer disclosure uses a more elementary and easy-to-read format to convey the same information.")); ECF No. 38 at 29 ("[W]hen [N]CRAs provide file information . . . , they do not reproduce that data in an exact carbon copy of the manner in which it is stored.").)

In response, CDIA points to the FTC's decision, in 2004, not to promulgate regulations that would have required "multi-language translations of centralized source materials, including the centralized source website itself."  (ECF No. 59-4 at 25 (citing *Free Annual File Disclosures*, 69 Fed. Reg. 35,468 (June 24, 2004)).)  CDIA argues that this decision not to promulgate regulations is evidence that "the very question as to whether the NCRAs should provide disclosures in languages other than English has already been considered and decided."  (*Id.*) However, the FTC's commentary clarified that its decision was a non-permanent one made, "at th[at] time," to give NCRAs a chance to implement the new obligations enacted in 2003 by Congress.  69 Fed. Reg. at 35,476.  CDIA cites no authority for the proposition that a federal agency declining to promulgate regulations should serve as a basis to preclude states from acting, decades later, in the form of legislation that does not conflict with the underlying statute.

In sum, there is nothing before the Court that persuades it that the 2019 amendment to the NJFCRA is "inconsistent" with the FCRA.  New Jersey's goal of providing broader access to consumer reports by making them available to consumers in languages other than English is consistent with Congress's objective in enacting the federal legislation, which is to ensure the "accuracy," "fairness," and "impartiality" of consumer reporting so that public confidence is not undermined.  *See* 15 U.S.C. § 1681.  CDIA may believe that it would be more efficient to have a "uniform" set of languages for credit file disclosures, but under our federal system, this is not an issue for this Court to decide.  *See, e.g.*, *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws . . . ."); *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 487 n.8 (1989) (Brennan, J., dissenting) ("[I]t is up to Congress, not this Court, to 'fashio[n] a legislative response.'").

Absent support for the conclusion that Congress intended, either expressly or impliedly, to preclude states from enacting legislation to enable consumers to request their credit files in languages other than English, this Court finds that the 2019 amendment to the NJFCRA is not preempted by the FCRA.

## C. First Amendment

The First Amendment challenge focuses on New Jersey's requirement that credit file disclosures be provided to consumers in English, Spanish, and at least ten other languages, plus any additional languages chosen by the Director of DCA, and whether this requirement withstands the appropriate level of constitutional scrutiny.[30]

---

[30]     The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I, and it applies to the States through the Due Process Clause of the Fourteenth Amendment, *see Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925).

### 1. COMMERCIAL SPEECH

Both parties submit that the file disclosures at issue are subject to qualified First Amendment protection under the commercial speech doctrine. The Court finds this consistent with how similar disclosures have been treated since the FCRA's enactment. *See, e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (finding that a consumer "credit report concerns no public issue" and "was speech solely in the individual interest of the speaker and its specific business audience"); *Yim v. City of Seattle*, 63 F.4th 783, 801 (9th Cir. 2023) (Wardlaw, J., concurring) ("Courts have also generally found that consumer credit reports, compiled for the purpose of targeted marketing or calculating interest rates, constitute commercial speech." (collecting cases)); *Trans Union Corp. v. F.T.C.*, 267 F.3d 1138, 1141 (D.C. Cir. 2001) ("Trans Union's target marketing lists are private speech warranting only qualified constitutional protection."); *Millstone v. O'Hanlon Reps., Inc.*, 528 F.2d 829, 833 (8th Cir. 1976) ("[C]onsumer credit reports . . . are 'commercial speech.'"); *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 307 (E.D. Pa. 2012) ("The appropriate test for analyzing the reduced First Amendment protection accorded to consumer report information is the Supreme Court's commercial speech doctrine."); *see also* Bastian Shah, *Commercial Free Speech Constraints on Data Privacy Statutes After Sorrell v. Ims Health*, 54 Colum. J.L. & Soc. Probs. 93, 118 (2020) ("The FCRA cases all lead to the same conclusion. Data collected from consumers, compiled for commercial interests, and designed to be sold for the purpose of advertising . . . constitutes commercial speech."). New Jersey's 2019 amendment to the NJFCRA is therefore subject to the level of constitutional scrutiny applicable to restraints on commercial speech.

### 2. STANDARD OF SCRUTINY

The level of scrutiny applied to commercial speech restraints varies by the type of restraint: either "restrictions on speech" or "disclosure requirements." *Dwyer v. Cappell*, 762 F.3d 275, 282

(3d Cir. 2014) (noting that "there exist different frameworks for analyzing restrictions on speech and disclosure requirements").  The qualitative difference between the two is that restrictions on speech prevent the speaker from "conveying information to the public," while disclosure requirements "seek only to require the[] [speaker] to 'provide somewhat more information than they might otherwise be inclined to present.'"  *Id.* at 280 (quoting *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 650 (1985)).

For restrictions on speech, the restraints must "withstand[] intermediate scrutiny under" the test set forth by the Supreme Court in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980).  *Id.* (citing *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 142 (1994)).  Under *Central Hudson*, "[t]he more misleading the [commercial speech], the more constitutional leeway is granted the States in restricting it."  *Id.*  If, however, the speech is not false, deceptive, or misleading, the State can restrict it "only if the State shows that the restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest."  *Ibanez*, 512 U.S. at 142.

Disclosure requirements and compelled speech, in comparison, "receive less rigorous scrutiny."  *Dwyer*, 762 F.3d at 281.  This is because disclosure requirements "trench much more narrowly" on First Amendment interests than prohibitions on speech, and the disclosures help dissipate the possibility of consumer confusion and deception.  *Zauderer*, 471 U.S. at 651 (citing *In re R.M.J.*, 455 U.S. 191, 201 (1982)).  That is not to say that disclosure requirements are without First Amendment implications.  *Id.*  The United States Supreme Court in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio* recognized that "unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."  *Id.*  The Court held, however, that First Amendment "rights are adequately

protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."  *Id.* at 651-52 (holding that an Ohio disciplinary rule was "reasonable enough" to overcome a First Amendment challenge when the rule remedied possible deception in attorney advertising).

The *Zauderer* framework was "reaffirmed" by the Supreme Court in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).  *Dwyer*, 762 F.3d at 282.  In *Milavetz*, Congress required debt relief agencies assisting consumers in bankruptcy to include certain disclosures in their advertisements.  *Milavetz*, 559 U.S. at 233-34.  The plaintiffs argued that intermediate scrutiny under *Central Hudson* should apply to those disclosures, but the Supreme Court disagreed and applied the *Zauderer* framework.  *Id.* at 249-50.  The Court explained that the challenged statute shared the same essential features of the rule at issue in *Zauderer*.  *Id.* at 250. Congress did "not prevent debt relief agencies . . . from conveying additional information," but instead, "the disclosures entail[ed] only an accurate statement identifying the advertiser's legal status and the character of the assistance provided" and were "intended to combat the problem of inherently misleading commercial advertisements."  *Id.*

Here, the State argues that there "is little question" that the 2019 amendment to the NJFCRA is a "disclosure requirement" that "need only pass *Zauderer* review."  (ECF No. 83 at 12.)  Further, the State contends that the statute "does not prevent the [NCRAs] from providing the disclosure in English," which is "already required by federal law," and it does not "otherwise limit in any way what information [NCRAs] can convey to consumers."  (*Id.*)

In opposition, CDIA urges the Court to apply intermediate scrutiny under *Central Hudson*,[31] arguing that New Jersey's law "require[s] the NCRAs to fundamentally alter the means

---

[31]      In its initial briefing, CDIA argued that "heightened" scrutiny should apply, even though commercial speech is implicated, because New Jersey's law "imposes speaker-and-content related

in which they store and disclose consumers' file information or provide an entirely different set of information" and that there "is no untoward conduct that would justify the infringement on speech."[32] (ECF No. 82 at 11-15.)

The Court agrees with the State that this case involves disclosure requirements, not speech restrictions. New Jersey's law does not prevent the NCRAs from conveying information. Instead, it requires the NCRAs to *disclose*, upon a consumer's request, the same consumer credit file disclosures that the NCRAs already provide in English but in Spanish or in one of the ten other languages chosen by the Director of DCA.[33] There is no affirmative limitation on speech. The appropriate level of scrutiny is thus the rational-basis test that the Supreme Court set forth in *Zauderer* and reaffirmed in *Milavetz*. *See Dwyer*, 762 F.3d at 281 (noting that the *Zauderer* test is characterized as "akin to rational-basis review" (citation omitted)).

### 3. APPLICATION OF THE ZAUDERER TEST

The *Zauderer* test comprises three inquiries: whether the disclosure is (1) purely factual and uncontroversial; (2) reasonably related to the governmental interest in preventing consumer confusion or deception; and (3) justified and not unduly burdensome. *Nat'l Inst. of Fam. & Life*

---

restrictions." (ECF No. 59-4 at 34-35.) The Court disagrees. The disclosure requirement applies neutrally to all NCRAs, and it does not favor one viewpoint over any other. There is no indication that New Jersey's law "has the practical effect of promoting some messages or some speakers based on the content of the speech or the identity of the speaker," which might justify heightened scrutiny. *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 138 (3d Cir. 2020).

[32] CDIA takes the position that *Zauderer* should be limited to disclosure requirements that apply to misleading advertisements. Precedent from various Circuits has rejected such a strict interpretation, however. *See, e.g.*, *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) ("[T]he circuits' precedents . . . have unanimously held that *Zauderer* applies outside the context of misleading advertisements.").

[33] Specifically, the 2019 amendment provides that the NCRAs "shall make the information subject to *disclosure* pursuant to this section available to a consumer upon the consumer's request." N.J. Stat. Ann. § 56:11-34(e) (emphasis added).

*Advocs. v. Becerra*, 585 U.S. 755, 768 (2018); *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540-42 (D.C. Cir. 2020); *Dwyer*, 762 F.3d at 281-83.   A disclosure requirement must satisfy all three criteria to be constitutional.   *Id.*   The parties do not dispute that the disclosure requirement in this case involves purely factual and uncontroversial information.[34]   Therefore, the Court must determine whether the 2019 amendment is justified, not unduly burdensome, and reasonably related to the State's interest in preventing consumer confusion or deception.   Ultimately, the State bears the burden of proof.   *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 776.

The State submits that the aim of the 2019 amendment to the NJFCRA is to "ensure non-English speaking residents in New Jersey are able to access and understand their credit reports." (ECF No. 43-1 at 33 (citing Press Release, New Jersey Assembly Democrats, *Credit Reports Will Be Available in Spanish and Other Languages Under New Law* (July 19, 2019)).)   In support of the law's objective, the State primarily cites to two studies and several data points.   The first study was issued in 2010 by the United States Government Accountability Office, which found that an individual's limited proficiency in English[35] can create significant barriers to financial literacy and to conducting everyday financial affairs.   (ECF No. 43-1 at 33-34 (citing U.S. Gov't Accountability Off., GAO-10-518, *Consumer Finance Factors Affecting the Financial Literacy of Individuals With Limited English Proficiency* (2010)).)   For example, such individuals can face

---

[34]   (*See* ECF No. 82 at 2 ("[T]he NCRAs' file disclosures include accurate, truthful, non-misleading federally-required information . . . ."); ECF No. 83 at 13 ("[I]t requires disclosure of 'purely factual and uncontroversial information' . . . .").)

[35]   Limited English proficiency (LEP) refers to anyone above the age of five who reports speaking English less than "very well," as classified by the United States Census Bureau.   (ECF No. 55 at 7 (citing Jie Zong & Jeanne Batalova, *The Limited English Proficient Population in the United States*, Migration Pol'y Inst. (July 8, 2015), https://www.migrationpolicy.org/article/limited-english-proficient-population-united-states   (last visited on March 13, 2024)).)

challenges completing account applications, understanding contracts, and resolving problems such as erroneous bills.  (*Id.*)

The second study is a 2017 report from the Consumer Financial Protection Bureau, which found that limited English proficient consumers often face obstacles in accessing financial products and services, including financial disclosures not generally available in a consumer's preferred language.  (*Id.* at 33 (citing CFPB, *Spotlight on Serving Limited English Proficient Consumers* (2017)).)  The study also found that the "effective integration of LEP consumers into the financial marketplace has the potential to create positive benefits for consumers and the financial services industry alike."  (*Id.*)

As to the specific data points, New Jerseyans speak "at least twenty different languages" and potentially "over 40 languages."  (*Id.* at 38; ECF No. 83 at 19.)  According to the New Jersey Department of Health, as of 2018, New Jersey's total population was approximately 8.8 million residents, about 1.9 million of whom are immigrants and refugees and about 460,000 of whom (or 5.2% of the total population) have limited English proficiency.  (ECF No. 43-1 at 36.)  As of 2022, the number of limited English proficient residents in New Jersey was as high as 12.7%.  (ECF No. 83 at 15.)  The State submits that based on New Jersey's substantial LEP population requiring "uniform translation, at least for the most frequently spoken languages—is a reasonable means to avoid" consumer confusion.  (*Id.* at 16.)

Specifically, the 2019 amendment to the NJFCRA provides that the NCRAs shall make credit file disclosures available upon a consumer's request in Spanish or any other language that the Director of DCA "determines is the first language of a *significant number* of consumers in the State."  N.J. Stat. Ann. § 56:11-34(e) (emphasis added).  The Director's determination shall be based on the "numerical percentages of all consumers in the State for whom English or Spanish is not a first language or in a manner consistent with any regulations promulgated by the [D]irector

for this purpose." *Id.* The amendment further provides that the Director "shall require that the information is made available in *at least* the 10 languages other than English and Spanish that are most frequently spoken as a first language by consumers in this State." *Id.* (emphasis added).

The State contends that requiring disclosures in at least ten additional languages other than English and Spanish is reasonable because New Jerseyans speak at least twenty if not forty different languages and at least one NCRA is already providing translation services in Spanish. (ECF No. 43-1 at 38; ECF No. 83 at 19.) According to the State, the ten most spoken languages after English in New Jersey homes are as follows:

| Top 10 Languages Spoken at Home Other Than English in New Jersey | | | |
|---|---|---|---|
| | | New Jersey | |
| | | Estimate | Percent |
| Rank | Total | 8,882,190 | 100.0% |
| 1 | Spanish | 3,215,353 | 36.2% |
| 2 | Filipino/Tagalog | 310,877 | 3.5% |
| 3 | Chinese | 301,994 | 3.4% |
| 4 | Hindi | 293,112 | 3.3% |
| 5 | Korean | 293,112 | 3.3% |
| 6 | Gujarati | 284,230 | 3.2% |
| 7 | Portuguese | 239,819 | 2.7% |
| 8 | Arabic | 222,055 | 2.5% |
| 9 | Polish | 186,526 | 2.1% |
| 10 | Russian | 168,762 | 1.9% |

[(ECF No. 43-1 at 37.)]

Although the State has not provided data as to how many of these individuals are also limited English proficient, the State contends that it struck a reasonable balance in the 2019 amendment

to the NJFCRA by covering only the "ten most spoken languages after English and Spanish, whose speakers comprise in the aggregate about 62.1% of the State's population."  (ECF No. 58-1 at 17.)

CDIA acknowledges that consumer protection may be a substantial governmental interest, but it contends that the State arbitrarily set the disclosure requirement at ten languages (in addition to Spanish) without stating any legal or factual basis for that number of languages.  (ECF No. 59-4 at 36; ECF No. 60 at 36-38.)  CDIA also highlights findings in the State's own evidence that indicate that (1) "offering information in languages other than English does not necessarily mean that all LEP populations will be able to access, understand or use the information provided"; (2) "requiring translations will not necessarily ensure that 'materials are written at a reading level that is accessible to the average U.S. adult regardless of the language used'"; and (3) "the number of certified financial interpreters and translators is low and the availability of translation services with the capacity to handle high volumes of translation work is limited, particularly for languages other than Spanish."  (ECF No. 60 at 34 (quoting *Spotlight on Serving Limited English Proficient Consumers*, CFPB at 9 (2007)).)  Finally, CDIA submits that the State's benchmark of relying on the top ten languages spoken in New Jersey is misguided because the State's evidence also shows that Spanish alone accounts for more than sixty-six percent of New Jerseyans with language access needs.  (*Id.* at 37.)  Therefore, only about "1.75% of New Jersey's population requires support in a language other than English or Spanish."  (*Id.* at 37-38.)  Accordingly, CDIA contends that New Jersey's law is not reasonably related to its purpose.  (ECF No. 82 at 16.)

The parties have not cited, nor has the Court identified, any case directly on point.  The Third Circuit applied the *Zauderer* standard in *Dwyer v. Cappell*, which dealt with attorney advertising disclosures.  762 F.3d at 275.  In *Dwyer*, an attorney challenged a state judiciary committee guideline that required attorney advertisements to include the full text of a judicial opinion rather than simply excerpts or quotations from the opinion.  *Id.* at 277-79.  The Third

48

Circuit held that the guideline was not reasonably related to preventing consumer deception.  *Id.* at 283.  The Court reasoned that "[p]roviding a full judicial opinion does not reveal to a potential client that an excerpt of the same opinion is not an endorsement.  Indeed, providing the full opinion may add only greater confusion."  *Id.*  The Court also held that the disclosure was unduly burdensome.  *Id.*  The Court reasoned that the guideline was "onerous" and "so cumbersome that it effectively nullifie[d]" advertising by the attorney's desired means.  *Id.* at 283-84.

Beyond attorney advertising, the United States Supreme Court in 2018 considered a California law requiring unlicensed pregnancy-related clinics to post a government-drafted notice on site and in advertising materials stating that the clinics were not licensed.  *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 764.  The notice had to be "the same size or larger font than the surrounding text, or otherwise set off in a way that dr[e]w[] attention to it."  *Id.* at 764-65.  The notice also had to be "in English and any additional languages specified by state law," which "[i]n some counties" meant the notice had to "be spelled out in 13 different languages."  *Id.* at 763- 65.

Applying *Zauderer*, the Supreme Court found that California had provided only hypothetical justifications for the unlicensed-clinic notice.  *Id.* at 776-77.  The Court also found that the law unduly burdened protected speech: it required covered facilities to post California's precise notice without consideration of what the facilities said on site or in their advertisements; it applied to a "narrow subset of speakers"; it forced facilities to "call attention to the notice, instead of [their] own message, by some method such as larger text or contrasting type or color"; and it had to "be posted in English and as many other languages as California [chose] to require."  *Id.* at 777-78.  These requirements, wrote the Court, would likely "drown[] out [a] facility's own message" and "chill their protected speech."  *Id.* at 778.

Here, the Court agrees with the State that requiring the translation of credit file disclosures serves the interest of preventing consumer confusion and deception and curbing barriers to

financial literacy.  The studies and data cited by the State demonstrate that there are a significant number of limited English proficient individuals in New Jersey who would benefit from credit file disclosures in languages other than English.  As highlighted by the NCLC, New Jersey has the fifth highest share of limited English proficient residents in the United States.[36]  (ECF No. 55 at 9.)  The NCLC contends that without the translation requirement more than 1.6 million New Jersey residents would be left with limited options to understand their complex credit reports.  (*Id.* at 11.) And studies have found that where translated documents are not available, LEP consumers often resort to relying on friends and family members—and sometimes even children—to convey crucial financial information.  (*Id.* (citing Kleimann Communication Group, *Language Access for Limited English Proficiency Borrowers: Final Report* (April 2017), https://www.fhfa.gov/PolicyProgramsResearch/Policy/Documents/Borrower-Language-Access-Final-Report-June-2017.pdf (last visited March 13, 2024)).)  This poses a significant harm to consumers because credit reports, and the credit scores generated from them, determine whether a consumer can obtain a loan to purchase a home or an automobile, obtain insurance for both, open a new business, or finance their college education.  (*Id.* at 8.)  Therefore, by making credit file disclosures available to limited English proficient individuals in their preferred language, the State can help resolve errors in credit reporting and prevent long-term damage to their financial health.

The record before the Court clearly demonstrates that requiring credit file disclosures in Spanish is reasonably related to accomplishing the goals of New Jersey's legislation and is not

---

[36]     As of 2013, the highest concentration of LEP individuals were found in the six traditional immigrant-destination states—California (6.8 million or twenty-seven percent of the total LEP population), Texas (3.4 million, fourteen percent), New York (2.5 million, ten percent), Florida (2.1 million, eight percent), Illinois (1.1 million, four percent), and New Jersey (one million, four percent).  (ECF No. 55 at 7 (citing Jie Zong & Jeanne Batalova, *The Limited English Proficient Population in the United States*, Migration Pol'y Inst. (July 8, 2015), https://www.migrationpolicy.org/article/limited-english-proficient-population-united-states  (last visited March 13, 2024)).)

unduly burdensome.  Translating credit file disclosures to Spanish will benefit a "significant number" of consumers—anywhere between thirty-six to sixty percent of LEP residents in the State.  And Equifax has already begun to provide credit file disclosures in Spanish.  (ECF No. 43-1 at 38-39 (citing Carmen Reinicke, *Equifax will now offer credit reports in Spanish*, CNBC (Sept. 13, 2021), https://www.cnbc.com/2021/09/13/equifax-will-now-offer-credit-reports-in-spanish.html (last visited on March 13, 2024)).).  According to a press release issued by Equifax:

> Having a translated Spanish report available, free of charge, to consumers will go a long way in breaking down communication barriers for those who speak English as a second language . . . .  By providing credits reports in Spanish, we will help millions better understand, protect and enhance their financial well-being.

> [(ECF No. 55 at 16.)]

The State has not demonstrated, however, that requiring the translation of consumer file disclosures in *at least* ten more languages (in addition to Spanish) is reasonably related to achieving the State's interest and is not unduly burdensome.  While the *Zauderer* analysis need not involve evidentiary parsing, the evidence must demonstrate that the disclosure requirement is "reasonably related" to the State's interest of preventing consumer confusion.  *Am. Hosp. Ass'n*, 983 F.3d at 540 ("[T]he Secretary, relying on complaints from consumers, studies of state initiatives, and analysis of industry practices, reasonably concluded that the rule's disclosure scheme will help the vast majority of consumers.").  Here, it is unclear on the current record whether requiring disclosures in at least ten additional languages will help a significant number of consumers in the State and is reasonably related to the State's interest.

For example, the evidence cited suggests that the ninth and tenth language requirement may serve less than two percent of consumers in the State.  (ECF No. 43-1 at 36-37.)  Indeed, the State of New Jersey recently enacted legislation that requires governmental entities to provide vital documents and translation services in at least seven of the most common non-English languages.

A. 3837/S. 2459 (2023).  Specifically, the statute provides that "translations of vital documents and information shall be in at least the seven most common non-English languages spoken by individuals with limited-English proficiency in this State, based on United States Census Bureau American Community Survey data."[37]  *Id.*  The Internal Revenue Service also now provides on its website tax information in seven languages in addition to English.  *See* Website of the Internal Revenue Service, "IRS.gov offers tax help in a variety of languages," https://www.irs.gov/newsroom/irsgov-offers-tax-help-in-a-variety-of-languages   (last   visited March 13, 2024).  All of this serves to raise unanswered questions as to whether New Jersey's translation requirement is reasonable.  Therefore, the Court finds that the State has not shown that requiring credit file disclosures in *at least* ten languages is not unnecessarily burdensome in light of the need to secure the statutory objectives.

### 4.  Scope of Relief

Because New Jersey's requirement that credit file disclosures be provided in at least ten languages (in addition to Spanish) has not been shown to be reasonably related to the State's interest and not unduly burdensome, the Court must consider the scope of relief.

The United States Supreme Court has explained that "[g]enerally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem. [They] prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force or to sever its problematic portions while leaving the remainder intact."  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006) (citations

---

[37]     The legislation was amended to require seven languages, as opposed to the fifteen languages originally proposed.  *See* Website of the New Jersey Legislature, *Bill S2459 Session 2022-2023*, https://www.njleg.state.nj.us/bill-search/2022/S2459 (last visited on March 13, 2024).  The legislation also requires the translations to be implemented on a rolling basis with the five most common non-English languages implemented in the first year and two additional non-English languages to be implemented within two years of the statute's effective date.  *Id.*

omitted); *see also Kyocera Document Sols. Am., Inc. v. Div. of Admin.*, Civ. No. 23-4044, 2023 WL 8868837, at *21 (D.N.J. Dec. 22, 2023) ("[T]he Supreme Court has counseled that, when confronting a constitutional flaw in a statute, courts should 'try to limit the solution to the problem.'" (citation omitted)).  This is in part due to the concern that facial challenges "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008).

Three "interrelated principles" are ordinarily considered when deciding what relief to grant upon a constitutional challenge to a statute.  *First*, courts should "try not to nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329.  The "normal rule" is that "partial, rather than facial, invalidation is the required course." *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).  *Second*, although courts should strive to "salvage" laws, they must simultaneously restrain themselves from "rewrit[ing] state law to conform it to constitutional requirements." *Id.* (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)). *Third*, "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Id.* at 330 (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979) (Powell, J., concurring in part)).  The critical question is: "Would the legislature have preferred what is left of its statute to no statute at all?" *Id.*

When considering whether to sever an unconstitutional provision in a state statute, our courts have directed that the "issue of severability . . . is a question of state law and requires an inquiry into legislative intent." *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 396 (3d Cir. 2012) (citations omitted); *see also Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) ("Severability is of course a matter of state law.").  Under New Jersey law, "a court has the power to declare a portion of a statute unconstitutional, while leaving the remainder of the law

intact." *L. Feriozzo Concrete Co. v. Casino Reinvestment Dev. Auth.*, 776 A.2d 254, 263 (N.J. Super. Ct. App. Div. 2001) (citing N.J. Stat. Ann. § 1:1-10). Nevertheless, "[t]he doctrine of severance . . . is to be applied with caution and attention to the legislative intent." *Commc'ns Workers of Am., AFL-CIO v. Florio*, 617 A.2d 223, 236 (N.J. 1992).

To sever an unconstitutional provision, a court "must determine whether 'the objectionable feature [can] be excised without substantial impairment of or conflict with the over-all legislative purpose.'" *New Jersey Retail Merchants Ass'n*, 669 F.3d at 396 (quoting *New Jersey Chapter, Am. Inst. of Planners v. New Jersey State Bd. of Pro. Planners*, 227 A.2d 313, 319 (N.J. 1967)). "[T]here must be such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative." *Id.* (quoting *Affiliated Distillers Brands Corp. v. Sills*, 289 A.2d 257, 259 (N.J. 1972)). "When 'different parts of the statute are not so intimately connected with and dependent upon each other so as to make the statute one composite whole[,] unconstitutional parts may be rejected and the constitutional parts may stand.'" *Id.* at 397 (quoting *Lane Distributors v. Tilton*, 81 A.2d 786, 796-97 (N.J. 1951)). "An example of the sort of dependency that makes the statute one composite whole is where a provision defining terms used in the statute cannot be severed from the remainder of the statute without rendering the statute meaningless or confusing." *Id.*

Ultimately, whether "'judicial surgery' should be utilized depends upon whether the Legislature would have wanted the statute to survive." *Chamber of Com. of U. S. v. State*, 445 A.2d 353, 363 (N.J. 1982). "Put another way, '[b]efore performing judicial surgery to save a particular enactment, a court must determine whether, considering the particular defect involved, the legislative body in question would prefer to have the enactment survive as corrected or die.'" *Selvaggi v. Borough of Point Pleasant Beach*, Civ. No. 22-00708, 2022 WL 1664623, at *11

(D.N.J. May 25, 2022) (quoting *Torres v. Mun. Council of City of Paterson*, 2007 WL 1712707, at *8 (N.J. Super. Ct. App. Div. June 15, 2007)).

Here, the Court has found that the 2019 amendment to the NJFCRA is not preempted by federal law and that the State has a legitimate interest in preventing consumer confusion and in curbing barriers to financial literacy.  It is also clear that New Jersey has a significant number of limited English proficient consumers to warrant such legislation.  Moreover, the Court has found that requiring credit file disclosures in Spanish does not implicate any First Amendment concerns—indeed, Equifax is already voluntarily doing so.  The constitutional flaw in the statute thus relates narrowly to the requirement that NCRAs provide credit file disclosures in *at least* ten more languages.  Phrased differently, the current record does not support setting a floor this high.

Rather than invalidate the entire statute based on this single defect, the Court will sever the provision that requires consumer credit file information to be made available by NCRAs "in at least 10 languages other than English and Spanish that are most frequently spoken as a first language by consumers in this State."[38]  N.J. Stat. Ann. § 56:11-34(e).  The Court's holding does not affect the remainder of the 2019 amendment to the NJFCRA, nor does it conflict with the overall legislative purpose.  With this particular provision severed, the statute still requires the Director of DCA to promulgate regulations to determine the languages, other than English and Spanish, in which to require credit file disclosures based on the "numerical percentages of all consumers in the State for whom English or Spanish is not a first language or in a manner consistent with any regulations promulgated by the [D]irector for this purpose."  *Id.*

---

[38]    The sentence that shall be excised is: "The director shall require that the information is made available in at least the 10 languages other than English and Spanish that are most frequently spoken as a first language by consumers in this State."  N.J. Stat. Ann. § 56:11-34(e).

If CDIA objects to the languages that the Director's regulations require and the reasons given for those languages, that may justify an as-applied challenge considering whatever facts are relevant at that time.  *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (stating that an as-applied approach "is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments").

## VII.   CONCLUSION

For the reasons set forth above, and other good cause shown, Defendant's Motion for Summary Judgment (ECF No. 58) is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion for Summary Judgment (ECF No. 59) is **GRANTED** in part and **DENIED** in part.  An appropriate Order follows.


Dated:  March 27, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

56